**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| M.F., a minor, by and through his father, | § | |
| MICHAEL FISHER, and his mother, | § | |
| KATHERINE FISHER, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:23-cv-01102-O |
| | § | |
| v. | § | |
| | § | |
| CARROLL INDEPENDENT | § | JURY TRIAL DEMANDED |
| SCHOOL DISTRICT, WHITNEY | § | |
| WHEELER, in her individual capacity | § | |
| and capacity as Principal of Durham | § | |
| Intermediate School, AND KIM RAY, | § | ORAL ARGUMENT REQUESTED |
| in her individual capacity and capacity | § | |
| as Assistant Principal and Campus | § | |
| Behavior Coordinator of Durham | § | |
| Intermediate School, | § | |
| | § | |
| Defendants. | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND REQUEST FOR EMERGENCY HEARING**

SBAITI & COMPANY PLLC

**Mazin A. Sbaiti**
Texas Bar No. 24058096
mas@sbaitilaw.com
**Griffin S. Rubin**
Texas Bar No. 24121809
gsr@sbaitilaw.com
Dallas Arts Tower
2200 Ross Ave., Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367

**ATTORNEYS FOR PLAINTIFF**

**TABLE OF CONTENTS**

I.   Procedural History ...................................................................................... 2

II.  Factual Background .................................................................................... 3

III. Legal Standard ........................................................................................... 8

IV.  Argument and Authorities ......................................................................... 9

     A.   Plaintiff M.F. is Likely to Succeed on the Merits of His
         First Amendment Claims .................................................................... 9

         i.   Public Schools Cannot Punish Students for Off-Campus,
            Out-of-School Speech That Does Not Cause Substantial,
            Material Disruption to School Activities ................................. 9

         ii.  Public Schools Lack the Authority to Punish Students for the
            Content Expressed in Their Off-Campus, Out-of-School Speech ...... 16

         iii. The Code of Conduct is Overbroad and Gives Public-School
            Officials an Impermissible Amount of Discretion to Censor
            Student Speech ....................................................................... 18

     B.   Absent Immediate Injunctive Relief, Plaintiff M.F. Will
         Suffer Irreparable Harm .................................................................... 22

     C.   Defendants Will Suffer No Irreparable Harm by Allowing Plaintiff
         M.F. to Attend Durham Intermediate School and Exercise His First
         Amendment Rights on His Own Time ................................................ 23

     D.   The Public Interest Favors the Protection of Student Speech Rights ...... 24

V.   Conclusion ............................................................................................... 24

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) .................................................................................................. 19

*Baumgartner v. United States*,
  322 U.S. 665 (1944) .................................................................................................. 12

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) .................................................................................... 23

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  142 S. Ct. 1464 (2022) .............................................................................................. 17

*City of Los Angeles v. Alameda Books, Inc.*,
  535 U.S. 425 (2002) .................................................................................................. 18

*Cohen v. California*,
  403 U.S. 15 (1971) .................................................................................................... 13

*Connally v. Gen Constr. Co.*,
  269 U.S. 385 (1926) .................................................................................................. 19

*Clark v. Prichard*,
  812 F.2d 991 (5th Cir. 1987) ...................................................................................... 9

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................................. 22

*Erznoznik v. Jacksonville*,
  422 U.S. 205 (1975) .................................................................................................... 9

*Fenico v. City of Philadelphia*,
  70 F.4th 151 (3d Cir. 2023) ...................................................................................... 14

*G&V Lounge v. Mich. Liquor Control Comm'n*,
  23 F.3d 1071 (6th Cir. 1994) .................................................................................... 24

*Gibson v. Tex. Dep't of Ins. – Div. of Workers' Comp.*,
  700 F.3d 227 (5th Cir. 2012) .................................................................................... 17

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) .................................................................................................. 19

*Greer's Ranch Café v. Guzman*,
    540 F. Supp. 3d 638 (N.D. Tex. 2021) ............................................................ 8, 9

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) ............................................................................... 11

*Hustler Magazine v. Falwell*,
    485 U.S. 46 (1988) .............................................................................................. 21

*J.C. v. Beverly Hills Unified Sch. Dist.*,
    711 F. Supp. 2d 1094 (C.D. Cal. 2010) ............................................................. 14

*J.S. v. Blue Mt. Sch. Dist.*,
    650 F.3d 915 (3d Cir. 2011) (en banc) .......................................................... 18, 22

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021) ................................................................................. passim

*Marusak v. Sema Constr.*,
    No. 4:21-cv-00475, 2021 U.S. Dist. LEXIS 247219 (N.D. Tex. Dec. 29, 2021) ...................... 9

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
    138 S. Ct. 1719 (2018) ........................................................................................ 13

*Matal v. Tam*,
    582 U.S. 218 (2017) ............................................................................................ 12

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ......................................................................... 22, 23

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
    862 F.3d 445 (5th Cir. 2017) .............................................................................. 23

*Police Dep't of Chi. v. Mosley*,
    408 U.S. 92 (1972) .............................................................................................. 16

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................... 17, 18

*Saxe v. St. Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ............................................................................... 16

*Shanley v. Ne. Indep. Sch. Dist.*,
    462 F.2d 960 (5th Cir. 1972) .............................................................................. 20

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................................. 18

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) ................................................................. 24

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................ 12

*Tex. Entm't Ass'n v. Hegar*,
  10 F.4th 495 (5th Cir. 2021) ................................................................. 17

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
  667 F.3d 570 (5th Cir. 2012) ................................................................. 19

*Thomas v. Bd. of Educ.*,
  607 F.2d 1043 (2d Cir. 1979) ........................................................... 12, 19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ........................................................................ 9, 16

*United States v. Brooks*,
  681 F.3d 678 (5th Cir. 2012) ................................................................. 19

*United States v. Petras*,
  879 F.3d 155 (5th Cir. 2018) ................................................................. 19

*United States v. Playboy Entm't Grp.*,
  529 U.S. 803 (2000) ............................................................................ 17

*Watkins v. City of Arlington*,
  No. 4:14-cv-381, 2014 U.S. Dist. LEXIS 95082 (N.D. Tex. July 14, 2014) .............. 22, 23, 24

*Williams v. Logan*,
  No. 3:22-cv-02877, 2023 U.S. Dist. LEXIS 122979 (N.D. Tex. June 5, 2023) ........................ 8

## Secondary Sources and Other Authorities

Barbara Fedders, *Schooling at Risk*, 103 Iowa L. Rev. 871 (2018) ............................................ 15

Charles Alan Wright et al., Federal Practice and Procedure (3d ed.) .......................... 8

David L. Hudson, Jr., Legal Almanac: The First Amendment: Freedom of Speech
  (2012) ................................................................................................. 19

Jacob Mchangama, *The Sordid Origin of Hate-Speech Laws*, HOOVER INST. (Dec. 1, 2011), https://www.hoover.org/research/sordid-origin-hate-speech-laws ........................................... 21

Mike Hixenbaugh & Antonia Hylton, *Federal Investigators Launch Civil Rights Probe into Southlake, Texas, Schools*, NBC NEWS (Nov. 17, 2021, 9:42 PM), https://www.nbcnews.com/news/us-news/southlake-texas-critical-race-theory-investigation-rcna5839 ................................................................................................................................... 21

Miranda Johnson & James Naughton, *Just Another School?: The Need to Strengthen Legal Protections for Students Facing Disciplinary Transfers*, 33 NOTRE DAME J.L. ETHICS & PUB. POL'Y 69 (2019) ........................................................................................................................ 16

This case involves an eleven-year-old child. Carroll Independent School District has violated—and threatens to continue to violate—the First Amendment by placing Plaintiff M.F., a student with a stellar academic and disciplinary record, in the District's Disciplinary Alternative Education Program for a single, social media post, made and published off campus, outside of school, and on M.F.'s own time. In fact, the post was online for only a few hours, and was never publicly available while students at M.F.'s school were on campus.

School officials—specifically Defendants Whitney Wheeler and Kim Ray—invoked the District's Code of Conduct as a basis for this punishment, but their imposition of an oppressive sentence on M.F. for benign, off-campus, out-of-school speech based on a set of overbroad, vague standards allowed Defendants to discipline M.F. for constitutionally protected speech. On a scale of things other kids do, at worst, M.F.'s actions register as no more than normal verbal barb-throwing that every adolescent boy experiences. To call that "misconduct" casts doubt on every interaction that students may have outside of school. While one shudders to turn this into a slippery slope, the question is legitimate. To wit, the District suspended M.F. for three days, during which time he failed every assignment while a sham investigation took place—one in which M.F. underwent three police interrogations without his parents or a lawyer present; Defendants did not even tell M.F.'s parents beforehand—like they are supposed to.

Plaintiff is likely to succeed on the merits of his First Amendment claims for several reasons. _First_, the instances in which the District may regulate off-campus, out-of-school speech are far and few between. Such is the case here, not just because M.F.'s speech was made off campus, outside of school, and on M.F.'s own time, but also because the District has shown _zero_ evidence that M.F.'s speech constitutes "misconduct" or materially disrupted classwork or involved substantial disorder or invasion of the rights of others. The District's attempts to parent

M.F. are a state-sponsored run on the authority of M.F.'s parents, and the deeply rooted tradition and legal principles in this country resoundingly demonstrate that disciplining M.F. in this situation is a power resting exclusively with his parents.

*Second*, the District cannot punish students for engaging in free speech based on the speech's content. Censorship of speech based on content or viewpoint is almost always unconstitutional.

*Third*, the District's rules governing student-speech prohibitions are vague and overbroad, leaving far too much discretion to administrators and bureaucrats in the District to make subjective decisions about student speech.

All other requirements for a temporary restraining order are also met. Irreparable harm is presumed in First Amendment cases like this one, especially where ongoing punishment is threatened to punish speech. No amount of damages can adequately remedy the harms M.F. has and will continue to experience from Defendants' actions, while Defendants will suffer no harm from reinstating M.F. at Durham Intermediate School during this litigation. And in this Circuit, protecting First Amendment freedoms is always in the public interest.

Starting today, M.F.'s placement in the District's Disciplinary Alternative Education Program robs M.F. of his constitutional rights, which constitutes the quintessential irreparable harm. With each passing hour and each passing class period, M.F. is deprived of his First Amendment rights—all at the hands of overreactive public-school administrators seeking to clamp down on their fiefdom. Plaintiff M.F. seeks a temporary restraining order enjoining the District from continuing to punish M.F. for his protected off-campus, out-of-school speech and directing his immediate reinstatement at Durham Intermediate School.

## I.      PROCEDURAL HISTORY

This action was commenced by Plaintiff's Original Verified Complaint and Request for Temporary Injunctive Relief (ECF No. 1) on October 29, 2023.

## II.   FACTUAL BACKGROUND

M.F. incorporates by reference all verified factual allegations made in the Original Verified Complaint (ECF No. 1) as though fully set forth below and also states:

M.F. is a student at Durham Intermediate School ("Durham"), a campus for fifth and sixth graders in the Carroll Independent School District (the "District"). He is an exemplary student with excellent grades and test scores. He has also received multiple awards for academic excellence. Further, his disciplinary history in the District is unblemished, with only minor infractions in the same offense category as being tardy to class.

On or about three months ago, M.F. and several other students were involved in the creation of a shared account on the social media platform TikTok. Over the past four weeks, M.F. has been caught in a cycle of mean-spirited exchanges between himself and another individual in his extended friend group ("Minor #1"). Minor #1 had many times made adolescent, hurtful comments to M.F. On Friday, October 20, 2023, M.F. and a friend of his ("Minor #2") were hanging out at Minor #2's house, outside of school hours. At or around 6:00 p.m. that evening, several posts were made on the shared TikTok account.

At least four posts were made on the shared TikTok account around that time. M.F. created and published two of the posts—they were the only posts M.F. had created and posted on the shared TikTok account since the account was created. One of the posts M.F. created and published was a picture of himself with text overlaying the image. The text spoke of M.F. in the third person and consisted of crude, self-denigrating comments. The other post M.F. created and published was a picture of Minor #1, the student who had been consistently teasing M.F. over the past few weeks.

Text overlayed the image of Minor #1 and referred to Minor #1 in an uncouth manner, stating, among other things, that Minor #1 was "so ugly," "super dumb," and that "nobody likes him." At or around 8:30 p.m. that same evening, thinking better of it, M.F. took down his posts.

The following Monday, M.F. learned at school that one of his classmates had been pulled out from class and questioned by Durham officials regarding the shared TikTok account. Sure enough, the District had commenced investigating the shared TikTok account the morning of Monday, October 23, after Wheeler received "a couple of emails with attachments of social media posts made over the weekend that could potentially be interpreted as bullying/cyberbullying and/or harassment of [Durham] students."

On Tuesday, October 24, during third period, M.F. was pulled out of class by a uniformed officer of the Southlake Police Department (the "Officer") and escorted M.F. to his office at the school. There, the Officer interrogated M.F. regarding the shared TikTok account. The Officer and M.F. were the only individuals in the room. The door was shut to the outside. M.F. was not informed of any of his rights by the Officer at any time. M.F.'s parents did not consent or even receive a call that their son was being interrogated by a police officer. Understandably scared, M.F., all of eleven years old, told the Officer he did not make the posts that had been published to the shared TikTok account that past Friday. At no point was M.F. apprised of his rights when the Officer ordered M.F. to take certain invasive actions as to the cell phone, not to mention that the cell phone is not owned by M.F.—it is owned by Mr. Fisher. After this interrogation, the Officer asked M.F. to return to class.

Roughly an hour later, at the beginning of fifth period, the Officer pulled M.F. out of class again and took M.F. to his office. This time, with the door open, the Officer demanded to know whether M.F. created the posts on the shared TikTok account from the previous Friday.

Understandably scared, M.F. denied involvement. During this interaction, the Officer told M.F. that he and Minor #2 were the only "suspects." The Officer released M.F. at that point to return to class. Approximately half an hour later, while still in fifth period, the Officer pulled M.F. from class again and took M.F. to his office. This time, Minor #2 was already in the office. The Officer began interrogating M.F. yet again, demanding to know of his involvement in the Friday posting on the shared TikTok account. Still understandably scared, M.F. denied involvement. This time, however, Minor #2 told M.F. that Minor #2 had told the Officer that M.F. and Minor #2 were responsible for the posts. Minor #2 also told M.F. that he had informed the District of their involvement because he had been promised a lesser disciplinary action if he admitted to the posts. At that time, M.F. told the Officer that he was involved in the posts from that previous Friday on the shared TikTok account.

That's correct: the Officer played two eleven-year-old children off one another to have one turn state's evidence.

Soon after, the Officer and Ray separated M.F. and Minor #2 into separate rooms. M.F. was taken to Ray's office. In Ray's office, Ray instructed M.F. to write and swear to a statement about his involvement in the posts from that previous Friday on the shared TikTok account. M.F. did so, but he did not mention the several instances of mean-spirited exchanges with Minor #1 in his statement. At that point, Wheeler came into Ray's office and orally reprimanded M.F. Wheeler, the principal of Durham and the individual supposed to be the adult in the room, castigated an eleven-year-old boy as though he were a criminal, ultimately scolding him by telling M.F. that his "heart" is "sneaky."

Once the District, by and through its employees and agents, had interrogated and intimidated an eleven-year-old student into a "confession" without informing him of his rights,

detaining him, and without parental consent, the District decided it was finally time for M.F.'s parents to be involved. This was the first instance that M.F.'s parents ever learned of M.F.'s potential involvement in the posts, the investigation, or the interrogations of their son. Roughly an hour after the District forced a "confession" out of M.F., Wheeler, who had just finished berating M.F., finally called Mrs. Fisher. But ultimately it was Ray who finally connected with Mrs. Fisher around 2:30 p.m. that day, at which time Ray informed Mrs. Fisher that M.F. had been involved in some posts made on the shared TikTok account and that M.F. was to serve out-of-school suspension until the District could conduct an investigation (not that the District already had). When Mrs. Fisher arrived at Durham to pick up M.F., Ray informed Mrs. Fisher that the District was contemplating whether to place M.F. in the District's Disciplinary Alternative Education Program ("DAEP") for M.F.'s supposed violation of the District's Student Handbook and Code of Conduct (the "Code of Conduct"). Mrs. Fisher asked for how long Ray believed the District was considering placing M.F. in DAEP, and Ray told her one to six weeks.

The next day, the Officer called Mrs. Fisher to ask if she had any questions about the situation. During their conversation, the Officer told Mrs. Fisher that in "most cases" in "most districts," serving a three-day suspension would be sufficient, but that it was "different" in the District because "the parents are more involved." On Thursday, October 26, Mr. and Mrs. Fisher received correspondence from the District via Ray, stating that she would be conducting an investigation into the purported wrongdoings of M.F. and that a meeting would be held the next day at the school for M.F. to tell his side of the story. Later that day, less than twenty-four hours before that meeting, Ray communicated that if Mr. and Mrs. Fisher wanted to bring counsel to the meeting on M.F.'s behalf, they would need to provide twenty-four-hour notice to the District—an impossible condition.

That next day, Friday, October 27, M.F., Mr. Fisher, Mrs. Fisher, M.F.'s grandfather, and counsel went to Durham for the meeting called by the District. Attending the meeting for the District were Wheeler, Ray, the Officer, and counsel for the District. Once there, Ray began reading from a script and stated that the meeting served as the administrative hearing into the matter at issue. In stating the "allegations" against M.F., Ray simply recited the provision from the Code of Conduct M.F. purportedly violated. When M.F.'s counsel asked Ray to state the factual allegations underlying M.F.'s purported infraction, Ray stated that she already had and proceeded to read once again from the Code of Conduct. When pressed by M.F.'s counsel yet again, Wheeler spoke up, stating that M.F. had posted inappropriate material on the shared TikTok account. M.F.'s counsel asked Wheeler to show what posts, if any, the District possessed and which of those posts M.F. created and published. Wheeler first showed the post showing Minor #1, for which M.F. took responsibility there and then. Wheeler then showed a second post and attributed it to M.F.—but when M.F. was asked by his counsel, he confirmed that he neither created nor published that post. The District had incorrectly attributed someone else's speech to M.F.

Next, M.F. was given the opportunity to tell his side of the story. Unlike during the District's interrogations, M.F. had spoken to his parents, had his parents present, and had counsel with him. As such, he was no longer scared of and confused by the situation, and he provided an accurate rendition of the events. He took responsibility for the posts he created and published, and expressed sincere remorse and regret for doing so. Before the meeting broke for further deliberations by the District, M.F.'s counsel directed Wheeler and Ray to various pages in the Code of Conduct listing the vast array of disciplinary actions the District permits as to its students—wherein placement in DAEP is listed as the second-most severe punishment aside from expulsion. Wheeler and Ray were asked if they considered any of the other disciplinary actions for

M.F. before DAEP, since M.F. is an excellent academic performer with no serious disciplinary infractions on his record. Wheeler and Ray had no answer to the question.

At the end of the meeting, Ray informed the attendees that the District would deliberate given M.F.'s statement that day and promptly inform the Fishers of the District's disciplinary decision.

Despite everything that occurred at that meeting and the ample time for the District to reconsider its decision, nothing changed. On Sunday, October 29, the District informed M.F. and his parents that the original recommendation would stand—M.F. was to report to DAEP for a sentence of forty-five school days beginning on Monday, October 30. Evidently, evidence had little—if anything—to do with the District's decision. Out of options to meaningfully address the egregious overexertion of authority the District had engaged in, M.F. and his parents turn to this Court to right what the off-the-rails officials of the District have wrought upon an eleven-year-old child.

### III.    LEGAL STANDARD

A temporary restraining order ("TRO") is an "extraordinary remedy." *Williams v. Logan*, No. 3:22-cv-02877, 2023 U.S. Dist. LEXIS 122979, at *4 (N.D. Tex. June 5, 2023). "A TRO is 'simply a highly accelerated and temporary form of preliminary injunctive relief,' which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (citation omitted); *see* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2951 (3d ed.) ("[A TRO] is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction and may be issued with or without notice to the adverse party.").

Courts may issue TROs if the moving party "establishes (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the balance of hardships weighs in the movant's favor; and (4) the issuance of the [TRO] will not disserve the public interest." *Greer's Ranch Café*, 540 F. Supp. 3d at 645. The moving party "must clearly carry the burden of persuasion on each element to prevail." *Marusak v. Sema Constr.*, No. 4:21-cv-00475, 2021 U.S. Dist. LEXIS 247219, at *2 (N.D. Tex. Dec. 29, 2021). Ultimately, "[t]he party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order . . . can be granted." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

## IV.   ARGUMENT AND AUTHORITIES

### A.   PLAINTIFF M.F. IS LIKELY TO SUCCEED ON THE MERITS OF HIS FIRST AMENDMENT CLAIMS

#### i.   Public Schools Cannot Punish Students for Off-Campus, Out-of-School Speech That Does Not Cause Substantial, Material Disruption to School Activities

"[S]tudents do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2044 (2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)); *see Tinker*, 393 U.S. at 511 ("School officials do not possess absolute authority over their students."). The First Amendment operates as a limit on governmental authority to punish students for their speech. *See id.* at 506–09; *see also Erznoznik v. Jacksonville*, 422 U.S. 205, 212 (1975) ("[M]inors are entitled to a significant measure of First Amendment protection."). Public schools generally may not punish student speech unless the speech "materially disrupts classwork or involves substantial

disorder or invasion of the rights of others,"[1] *Mahanoy*, 141 S. Ct. at 2045 (internal quotation marks and citation omitted)—demonstrating as much is no easy lift.

A few years ago, the Supreme Court did determine that public schools have at least some authority "in some off-campus circumstances." *Mahanoy*, 141 S. Ct. at 2045. But those circumstances are infrequent and relate directly to school activities and functions. *See id.* Though it did not provide considerable guidance as to when these off-campus circumstances may exist, the Supreme Court did delineate "three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech": (1) "a school, in relation to off-campus speech, will rarely stand *in loco parentis*"; (2) school regulation of off-campus student speech threatens to completely preclude students from exercising their free-speech rights; and (3) schools have an interest in protecting student expression, "especially when the expression takes place off campus." *See id.* "Taken together, these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished." *Id.*

This framework, though somewhat undefined, is rooted in common sense and Anglo-American tradition predating the United States Constitution. "[B]y enrolling a child in a public school, parents consent on behalf of the child to the relinquishment of some of the child's free-speech rights." *Id.* at 2051 (Alito, J., concurring). Rooted in the ancient conception of *in loco parentis*, the theory undergirding modern student-speech jurisprudence is that parents have impliedly consented to "a public school's exercise of a degree of authority that is commensurate with the task that the parents ask the school to perform." *Id.* at 2052. But enrolling a child in public

---

[1] The Supreme Court has also identified "three specific categories of student speech that schools may regulate in certain circumstances," none of which apply here because M.F.'s speech occurred off campus and outside of school. *See Mahanoy*, 141 S. Ct. at 2045.

school "cannot be treated as a complete transfer of parental authority over a student's speech" because, in American society, "parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children." *Id.* at 2053. And because "[p]arents do not implicitly relinquish all that authority when they send their children to a public school," "it would be far-fetched to suggest that enrollment implicitly confers the right to regulate what a child says or writes at all times of day and throughout the calendar year." *Id.*; *see Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) ("It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights.").

Such is the case here. None of the factors identified in *Mahanoy* are present, meaning that the District's authority to regulate M.F.'s speech is at least minimal, if not completely absent.

***First***, the District was not standing *in loco parentis* when M.F. engaged in the speech at issue. M.F. was off campus when he created and published his two posts. *See* Orig. Verif. Compl. at ¶¶ 15–16, ECF No. 1. M.F.'s speech did not occur on the District's property or at the site of a school-related activity on or off school property, or on a publicly or privately owned school bus or vehicle being used for transportation of students to or from school or a school-sponsored or school related activity. *See id.* Within a short time, M.F. even rescinded his speech, pulling it down from the shared TikTok account. *See id.* at ¶ 20. So in fact, not only did the speech for which Defendants are punishing M.F. occur off campus and outside of school, the posts M.F. created and published never existed while Durham students were on campus. Considering where M.F. engaged in this speech, circumstances were not present under which M.F.'s "actual parents c[ould not] protect, guide, and discipline" M.F. *Mahanoy*, 141 S. Ct. at 2046 (majority opinion); *see id.* ("Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility."). Therefore, the first *Mahanoy* factor cuts completely

against Defendants' regulation of M.F.'s speech. *See Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1044–45 (2d Cir. 1979) ("[O]ur willingness to defer to the schoolmaster's expertise in administering school discipline rests, in large measure, upon the supposition that the arm of authority does not reach beyond the schoolhouse gate.").

**<u>Second</u>**, the speech in question occurred outside of school hours. *See* Orig. Verif. Compl. at ¶¶ 15, 20, ECF No. 1. M.F. was not at school, a school-sponsored event, or any other function of the District when he posted the speech in question. It was a Friday evening—the end of the school week, the beginning of the weekend. When M.F. published the speech at issue, he was more than two days away from reentering the District's supervisory orbit. Defendants' aspiration to punish M.F. for speech from that timeframe is an attempt to control "all the speech" children like M.F. "utter[] during the full 24-hour day"—the Court "must be more skeptical of [the District]'s efforts to regulate off-campus speech," otherwise students may be unable to engage in "[off-campus] speech at all." *Mahanoy*, 141 S. Ct. at 2046. Given the time at which M.F. engaged in the speech at issue, the second *Mahanoy* factor also cuts completely against Defendants' regulation of M.F.'s speech.

**<u>Third</u>**, though Defendants' actions show otherwise, Defendants have an "interest in protecting [M.F.]'s unpopular expression." *Id.* While crude and perhaps ill-advised, M.F.'s speech is protected by the First Amendment. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (reciting the "bedrock principle underlying the First Amendment" that the government may not prohibit speech simply because society finds the speech "offensive or disagreeable"); *Matal v. Tam*, 582 U.S. 218, 223 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend."). And though Defendants no doubt believe that M.F.'s speech was of little or no value, the constitutional right to free speech does not depend on a state actor's assessment of

speech's value. In fact, the right to free speech includes "the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U.S. 665, 674 (1944).

To preempt what Defendants may argue in response, M.F. is of course not maintaining that schools are without recourse to address legitimate instances of bullying. *See Mahanoy*, 141 S. Ct. at 2057 (Alito, J., concurring) ("Perhaps the most difficult category involves criticism or hurtful remarks about other students. Bullying and severe harassment are serious (and age-old) problems, but these concepts are not easy to define with the precision required for a regulation of speech." (footnote omitted)). Even so, the Supreme Court identified "*serious* or *severe* bullying or harassment" as an "off-campus circumstance[]" in which public schools retain a regulatory interest—but a single instance of adolescent insults by a exemplary student with a clean disciplinary record does not square with this circumstance. *See id.* at 2045 (majority opinion) (emphasis added).

Furthermore, as *Mahanoy* focuses on, state actors like the District have an interest in preserving the "nurseries of democracy" that are the public schools. *See id.* Yet to the extent such interest affords Defendants any authority to regulate M.F.'s speech, Defendants' decision to punish M.F. for his speech—and in as draconian fashion as they did—conveys to M.F. and his young, impressionable schoolmates the exact *opposite* of what American values are. "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours," and free speech must remain steadfast even when "trifling and annoying instance[s] of individual distasteful abuse of [this] privilege" abound. *Cohen v. California*, 403 U.S. 15, 24–25 (1971).

This is why it is <u>Civics 101</u> that it is not "the role of the State or its officials to prescribe what shall be offensive." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018).

Instead of properly deferring to M.F.'s mother and father to parent their child regarding speech completely outside Defendants' purview, Defendants not only decided to parent M.F. but did so in a way that runs contrary to American constitutional values—stifle and punish speech. Doing so was a far cry from what the third factor *Mahanoy* considers, as the District's interest in regulating M.F.'s speech only appears where "the 'marketplace of ideas'" is safeguarded. Because Defendants failed to do so here, the third *Mahanoy* factor cuts against Defendants as well.

All in all, the *Mahanoy* factors reveal that Defendants' regulatory interest in M.F.'s off-campus, out-of-school speech is minimal, if not entirely nonexistent. *See Mahanoy*, 141 S. Ct. at 2046, 2048. But what really sinks Defendants' chances of presenting a viable case on the merits is the lack of evidence "of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the [District]'s action." *Id.* at 2047; *cf. Fenico v. City of Philadelphia*, 70 F.4th 151, 166 (3d Cir. 2023) ("[C]ourts have long required more than 'unadorned speculation as to the impact of speech.'" (citation omitted)). This evidence is requisite in a case like this, and the lack of such evidence dooms the state actor's case. *See Mahanoy*, 141 S. Ct. at 2047–48; *see also, e.g.*, *J.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1117–19 (C.D. Cal. 2010).

M.F.'s speech at issue never existed while Durham students were in or at school. The posts M.F. created and published came to be after school on Friday, October 20, and came down that same night. *See* Orig. Verif. Compl. at ¶¶ 15, 20, ECF No. 1. But before any school activities even picked up the following Monday morning, Defendants were themselves inciting the disruption to the educational environment through their "investigation" into the posts. *See id.* at ¶¶ 21–22.

In fact, the only indication Defendants gave as to *any* disruption potentially caused by M.F.'s speech was that Wheeler received screenshots of the posts over the weekend from unnamed

senders. *See id.* at ¶ 21. Without more, Defendants have no evidentiary basis to show that M.F.'s speech caused or even threatened to cause any disruption in Durham's educational environment. More likely than not, the overbearing pressure of parents in the District and the frequent criticism Wheeler and Ray have received from the community for being soft on bullying most likely caused Defendants to overreact and scapegoat an eleven-year-old child. *See id.* at ¶¶ 35–36, 40.

To add insult to injury, placing M.F. in DAEP is unequivocally a punitive measure Defendants are taking, and even though the District will claim that the educations and experiences at Durham and DAEP are equivalent, such a statement is not tethered to reality. For one thing, placement in DAEP is undoubtedly a punishment—the Code of Conduct labels it as such, and in fact, it reveals that DAEP is the harshest disciplinary action the District may take against a student other than expulsion. So placing M.F. in DAEP is clearly punitive. That stark reality is made worse by the individuals with whom M.F. will attend DAEP if the Court does not intervene—DAEP is mandatory under the Code of Conduct for disciplinary actions such as "[e]ngag[ing] in conduct punishable as a *felony*"; "[p]ossess[ing] a deadly weapon"; and "[e]ngag[ing] in conduct that contains the elements of the offense of public lewdness . . . or indecent exposure" under the Texas Penal Code. M.F.'s supposed infraction is not in the same *stratosphere* as these other infractions. Truth be told, for students in the District's intermediate schools, the only infractions that the Code of Conduct finds to warrant DAEP involve possession of weapons and drugs—again, nowhere even close to M.F.'s alleged infraction. And to make matters (somehow) even worse, DAEP is in no way like normal intermediate schools in the District—M.F. will not receive the same education in DAEP, will be severed from his social relationships, and no doubt will fall behind and suffer social stigma. *See, e.g.*, Barbara Fedders, *Schooling at Risk*, 103 Iowa L. Rev. 871, 874, 896–900 (2018) (detailing the many ways in which DAEP harms childhood development). *See generally*

Miranda Johnson & James Naughton, *Just Another School?: The Need to Strengthen Legal Protections for Students Facing Disciplinary Transfers*, 33 NOTRE DAME J.L. ETHICS & PUB. POL'Y 69 (2019).

In sum, there was no basis for Defendants to believe that M.F.'s posts would affect school activities—let alone the substantial, material disruption required by *Mahanoy*. Indeed, Defendants explained that M.F. was being punished because they disapproved of the *content* of his speech—not for any negative effects caused by the speech. Punishing M.F. under these circumstances diverges from the limitations on school authority. *See Mahanoy*, 141 S. Ct. at 2046–48. Defendants failed to heed Justice Alito's warning that "the regulation of many types of off-premises student speech raises serious First Amendment concerns, and school officials should proceed cautiously before venturing into this territory." *Id.* at 2058 (Alito, J., concurring). M.F.'s claim here is incredibly likely to succeed on the merits.

### ii.    Public Schools Lack the Authority to Punish Students for the Content Expressed in Their Off-Campus, Out-of-School Speech

M.F. was punished because he may have caused offense—not because he disrupted school activities. *See Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) ("The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it."). A "mere desire to avoid the discomfort and unpleasantness" that may follow some speech is not a sufficient justification to punish student speech. *Tinker*, 393 U.S. at 509; *see Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). It is especially pernicious here because, literally, the *only* evidence of classroom disruption here was caused by Defendants and their "investigation."

"A regulation of speech is facially content based under the First Amendment if it 'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (brackets omitted) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny." *Tex. Entm't Ass'n v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021).

Here, the Code of Conduct is clearly content-based. "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Reed*, 576 U.S. at 166 (2015).

Just on its face, the Code of Conduct's definition of "bullying" is content based: bullying involves "a single significant act or a pattern of acts by one or more students directed at another student that exploits an imbalance of power . . . and that . . . [m]aterially and substantially disrupts the educational process of the orderly operation of a classroom or school." Just within this facet of the definition, state actors, like Defendants, will hear speech and determine (i) whether the act is "significant," (ii) whether the act is part of a "pattern," (iii) whether the act "exploits an imbalance of power," and (iv) whether the act "[m]aterially and substantially disrupts the educational process of the orderly operation of a classroom or school." If a speaker (such as M.F.) has a different perspective on a particular viewpoint or subject matter than the Code of Conduct's enforcers (Defendants) and that speaker can be punished for speaking that viewpoint or about said subject matter, than the Code of Conduct is content based and presumed constitutionally infirm. *See Gibson v. Tex. Dep't of Ins. – Div. of Workers' Comp.*, 700 F.3d 227, 234 (5th Cir. 2012); *see also United States v. Playboy Entm't Grp.*, 529 U.S. 803, 817 (2000) ("'Content-based regulations are

presumptively invalid,' and the Government bears the burden to rebut that presumption.") (citation omitted); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 455 (2002) (Souter, J., dissenting) ("[S]trict scrutiny leaves few survivors.").

The First Amendment does not permit the District to punish M.F. merely because school officials like Wheeler and Ray were offended by statements M.F. made off campus, outside of school, and on his own time. *See J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011) (en banc) (finding school discipline based on speech "deemed 'offensive' by the prevailing authority" as constitutionally untenable under the First Amendment). Nor are they allowed to punish him today for a "pattern" that does not exist. M.F. has no history of anything like this, and two posts created, published, and taken down over the course of two hours is no pattern.

Given the sweeping breadth of the Code of Conduct's prohibitions on speech, if Defendants' punishment of M.F. is allowed to stand, public schools would be given the green light to exclude from school all students unwilling to sacrifice their First Amendment rights during their childhood. The First Amendment does not allow public schools to demand this of students. Schools must make room for student speech that administrators (and even other parents) find rude, ill-conceived, negative, or otherwise off-putting. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 (5th Cir. 2020) ("The difficulty with such disavowals is that regulations governing 'rude,' 'uncivil,' 'harassing,' or 'offensive' speech can in fact cover speech otherwise protected by the First Amendment.").

The content-based foundation from which the Code of Conduct's speech restrictions stem evidences the likely success on the merits of M.F.'s First Amendment challenge to the Code of Conduct.

### iii.  The Code of Conduct Is Overbroad and Gives Public-School Officials an Impermissible Amount of Discretion to Censor Student Speech

A restriction on speech violates the First Amendment if the state actor fails to (1) "articulate a proscription 'with sufficient definiteness that ordinary people can understand what conduct is prohibited,'" and (2) "provid[es] enough objective metrics that [the proscription] 'does not encourage arbitrary and discriminatory enforcement.'" *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 580 (5th Cir. 2012) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)); *see Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) (invalidating a statute "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application"). School regulation of student speech is overbroad when there is "a 'substantial' chance that the statute will chill the protected speech of third parties not before the court." *United States v. Petras*, 879 F.3d 155, 167 (5th Cir. 2018).

School regulations, such as the speech restrictions in the Code of Conduct, may be struck down for overbreadth "if in 'banning unprotected speech,' a 'substantial amount of protected speech is prohibited or chilled in the process.'" *United States v. Brooks*, 681 F.3d 678, 697 (5th Cir. 2012) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002)); *see* David L. Hudson, Jr., Legal Almanac: The First Amendment: Freedom of Speech § 2:7 (2012) ("A law is unconstitutionally overbroad if it sweeps too broadly and invades the area of protected expression. In other words, an overbroad law does the job too well and overkills the problem."). The District seems to believe that anything it does not like is "misconduct" or, worse, anything that might cause discussion in the classroom can circularly be considered "misconduct."

Several portions of the Code of Conduct contain vague, overbroad prohibitions on speech that purport to give school administrators—like Wheeler and Ray—nearly unlimited power to censor student speech without *any* objective criteria to cabin their discretion. *See Thomas*, 607

F.2d at 1051 ("The risk is simply too great that school officials will punish protected speech and thereby inhibit future expression. In addition to their vested interest and susceptibility to community pressure, they are generally unversed in difficult constitutional concepts such as libel and obscenity. Since superintendents and principals may act 'arbitrarily, erratically, or unfairly,' the chill on expression is greatly exacerbated." (citation and footnote omitted)). Again, when, as here, two children are having a disagreement, one child harasses another, and the District only takes issue when the latter does something back, it brings to the fore just how arbitrary and selective the District can apply discipline under the amorphous Code of Conduct.

Indeed, the Code of Conduct's plain text *disclaims* any objective standards for discipline of student speech, as the only apparent principle is a highly subjective and circular one—the District claims for itself "disciplinary authority" over any student "[f]or *any* misconduct substantially likely to create a material disruption of the orderly operation of school, *regardless of time or location*."

Construed by an overeager administrator of the District (like Wheeler or Ray), this guideline conceivably grants the District full autonomy over student speech in all places and at any time. Deciding on disciplinary action under this standard will necessarily involve subjective value judgments, and the judges here are local bureaucrats. This proposition should bewilder and horrify. *See, e.g.*, *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 977 (5th Cir. 1972) ("[T]he regulation in question is unconstitutionally vague because the blanket prohibition against 'distributions' or 'attempts to distribute' does not reflect any reasonable, constitutional standards of the First Amendment as applied to the orderly administration of high school activities. . . . If the school board here can punish students on the strength of this blunderbuss regulation for passing out any printed matter, off school grounds, outside school hours, and without any disruptions

whatsoever, then why cannot the school board also punish any student who hands a Bible to another student on a Saturday or Sunday morning, as long as it does so in good faith?").

Speech codes were invented by the Soviets to control their people, their thoughts, and their values. *See* Jacob Mchangma, *The Sordid Origin of Hate-Speech Laws*, HOOVER INST. (Dec. 1, 2011), https://www.hoover.org/research/sordid-origin-hate-speech-laws. It is easy to see how Defendants can simply select among student speech that individual administrators in the District value and punish those speakers with whom they disagree under the Code of Conduct's broad speech prohibition.

For instance, say an administrator in the District were staunchly opposed to Israel's response to the October 7 Hamas terrorist attacks—a subject ripe for discussion—and that administrator objected to a student voicing support on social media for Israel in the ongoing conflict because the administrator disagrees, and so that administrator claims that the student's off-campus speech is "substantially likely to cause disruption." It is not a stretch to see how that administrator could punish the Israel-supporting student.

Or maybe an example closer to home for the District—say an administrator were staunchly in favor of bringing critical race theory into the District's curriculum, but a student voiced opposition to such efforts on their social media. *See* Mike Hixenbaugh & Antonia Hylton, *Federal Investigators Launch Civil Rights Probe into Southlake, Texas, Schools*, NBC NEWS (Nov. 17, 2021, 9:42 PM), https://www.nbcnews.com/news/us-news/southlake-texas-critical-race-theory-investigation-rcna 5839. It is far from difficult to picture how that administrator might find such speech to be misconduct in their own conception and punish the student for speech the administrator does not approve of. *Cf., e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46, 55 (1988) ("'Outrageousness' in the area of political and social discourse has an inherent subjectiveness

about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression.").

These scenarios demonstrate the immensely broad swaths of protected speech that the Code of Conduct would apparently cover based on its plain text. And the Code of Conduct would seem to allow school officials to punish children for off-campus, out-of-school speech whether the statement is an opinion a school official disagrees with; a challenge to the District's authority or criticism of a school; a parody about administrators in the District that those administrators do not find funny; or a true, factual statement depicting the District in an insulting manner. The First Amendment does not abide censorship of protected speech, especially under such vague, overbroad standards enforced by subjective school administrators. *See J.S.*, 650 F.3d at 933 (permitting "schools to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school . . . would vest school officials with dangerously overbroad censorship discretion"). M.F. has thus shown the likelihood that the Code of Conduct's speech prohibits are impermissibly vague and overbroad under the First Amendment.

## B.   ABSENT IMMEDIATE INJUNCTIVE RELIEF, PLAINTIFF M.F. WILL SUFFER IRREPARABLE HARM

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012); *see Watkins v. City of Arlington*, No. 4:14-cv-381, 2014 U.S. Dist. LEXIS 95082, at *10–11, 40–41 (N.D. Tex. July 14, 2014) (O'Connor, J.).

M.F. is barred from his from the school of his choosing as punishment for his protected self-expression. And if he were restored to Durham but the Code of Conduct remained in force, he

would be subject to continuing censorship of his protected, off-campus, out-of-school speech. He is suffering, and in the absence of the immediate injunctive relief requested, he will continue to suffer irreparable harm. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (explaining that "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate").

### C.   DEFENDANTS WILL SUFFER NO IRREPARABLE HARM BY ALLOWING PLAINTIFF M.F. TO ATTEND DURHAM INTERMEDIATE SCHOOL AND EXERCISE HIS FIRST AMENDMENT RIGHTS ON HIS OWN TIME

The Court must balance the ongoing irreparable harm to M.F. against any harm that Defendants would suffer from the requested injunctive relief. Defendants, and the District in particular, have no legitimate interest in suppressing students' First Amendment rights. *See Opulent Life Church*, 697 F.3d at 298 (requiring the party opposing injunctive relief to "present powerful evidence of harm to its interests to prevent" the moving party from satisfying this element once the moving party's harm is determined to be irreparable). Thus, Defendants do not face any cognizable harm from allowing M.F. to attend Durham or from enjoining the provisions of the Code of Conduct that infringe on students' off-campus, out-of-school, protected speech. *See Watkins*, 2014 U.S. Dist. LEXIS 95082, at *41.

In this, as in many student-speech cases, Defendants simply cannot demonstrate, let alone articulate, any hardship that may result from the Court granting this motion. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017) (determining that a state "can never have a legitimate interest in administering [a regulation] in a manner that violates federal law"). This is particularly so with respect to attempts to regulate student speech and conduct protected by the First Amendment that takes place off campus and outside of school. As such, Defendants will suffer no harm if the Court grants the requested TRO.

**D.      THE PUBLIC INTEREST FAVORS THE PROTECTION OF STUDENT SPEECH RIGHTS**

The Court must also weigh the effect on the public of enjoining the Code of Conduct's speech prohibitions and reinstating M.F. at Durham. This factor supports M.F.'s request for a TRO because injunctive relief "protecting First Amendment freedoms [is] *always* in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (emphasis added) (internal quotation marks and citation omitted); *see G&V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Accordingly, this factor also weighs in M.F.'s favor. *See Watkins*, 2014 U.S. Dist. LEXIS 95082, at *42–43.

## V.      CONCLUSION

All four factors for granting a temporary restraining order weigh in Plaintiff M.F.'s favor. For these reasons, Plaintiff M.F. respectfully requests that this Court grant the motion for temporary restraining order and enter the accompanying proposed order.

Dated: October 30, 2023                                  Respectfully submitted,

                                                         */s/ Griffin S. Rubin*
                                                         **Mazin A. Sbaiti**
                                                         Texas Bar No. 24058096
                                                         mas@sbaitilaw.com
                                                         **Griffin S. Rubin**
                                                         Texas Bar No. 24121809
                                                         gsr@sbaitilaw.com
                                                         **SBAITI & COMPANY PLLC**
                                                         Dallas Arts Tower
                                                         2200 Ross Ave., Suite 4900W
                                                         Dallas, Texas 75201
                                                         T: (214) 432-2899
                                                         F: (214) 853-4367

                                                         **ATTORNEYS FOR PLAINTIFF**