**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **M.F, a minor, by and through his father, MICHAEL FISHER, and his mother, KATHERINE FISHER,** | § § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO. 4:23-cv-01102-O** |
| **CARROLL INDEPENDENT SCHOOL DISTRICT, WHITNEY WHEELER, in her individual capacity as Principal of Durham Intermediate School, and KIM RAY, in her individual capacity and capacity as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School,** | § § | |
| **Defendants.** | | |

---

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR EMERGENCY HEARING AND BRIEF IN SUPPORT

---

**TO THE HONORABLE JUDGE REED O'CONNOR, UNITED STATES DISTRICT JUDGE**:

COMES NOW, Carroll Independent School District ("District"), Whitney Wheeler, and Kim Ray (collectively the "Defendants" or the "District") and files their Response in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Request for Emergency Hearing and Brief in Support. In support of this motion, Defendant would respectfully show the Court as follows:

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................. 1

II. STATEMENT OF FACTS............................................................................................... 2

III. LEGAL STANDARD..................................................................................................... 5

IV. ARGUMENT AND AUTHORITIES............................................................................. 6

   A.  Plaintiff M.F. is unlikely to succeed on the merits of his First Amendment Claims.......... 7

      i.  Public schools can regulate and enact appropriate discipline for off-campus student speech that causes a substantial disruption to the educational process.................................... 8

      ii. Public schools have been granted the authority to regulate off-campus speech in limited circumstances, including when there is a substantial disruption to the educational process and when the speech constitutes severe bullying, harassment, or threatens students.. 9

      iii. The District's Student Code of Conduct is consistent with federal law and provides a clear explanation of the instances when the District is permitted by law to use its discretion in regulating and disciplining certain off-campus speech.......................................................... 12

   B.  Absent injunctive relief, Plaintiff M.F. will not suffer irreparable harm. ........................ 14

   C.  The threated "injury" to the Plaintiff of being required to serve a few weeks in DAEP as discipline pursuant to District policy does not outweigh the harm the Defendants have faced and continue to face. ........................................................................................................... 15

   D.  Public interest favors supporting District administration and local policies when they are in compliance with the law. ................................................................................................... 17

V. CONCLUSION AND PRAYER ...................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Goss v. Lopez*, 419 U.S. 565, 574 (1975) ....................................................................... 14

*Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 644–45 (N.D. Tex. 2021) ........................ 5

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003) ................................................................................................................ 6, 16

*Khan v. Fort Bend Indep. Sch. Dist.*, 561 F.Supp.2d 760 (S.D. TX 2008) .................................. 16

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2044-2045 (2021) ................................. passim

*Nevares v. San Marcos Indep. Sch. Dist.*, 111 F.3d 25, 26-27 (5th Cir. 1997) ............................ 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ............................ passim

*Williams v. Logan*, No. 3:22-cv-02877, 2023 U.S. Dist. LEXIS 122979, at *4 (N.D. Tex. June 5, 2023) ....................................................................................................................... 5

**Statutes**

Texas Education Code Section 37.0832 ........................................................................ 16

# I. INTRODUCTION

This case centers around the discipline of an intermediate school student who engaged in harmful bullying and cyberbullying against several classmates. While the cyberbullying took place outside of school, the substantial impact of Plaintiff's words and actions had on his classmates, as well as the substantial disruption his actions have had on the overall educational environment for the last 14 days, have reached such a level that it significantly impacted the District's ability to effectively educate and keep students safe.

The Plaintiff contends that this case involves a child with an unblemished record and an outstanding academic history. Presenting the student, M.F., as an innocent victim of an oppressive school district, the Plaintiff argues that, in the spectrum of typical adolescent behavior, M.F.'s actions should be viewed—at worst—as no more than "normal barb-throwing that every adolescent boy experiences." The Plaintiff seeks to downplay the inappropriate and ill-intended actions of this child, invoking the age-old excuse that "boys will be boys", thereby perpetuating the societal inclination to dismiss offensive, hurtful, and aggressive behavior in boys as an inherent part of their biological predisposition toward roughness.

However, the Plaintiff overlooks the significant impact of the student's actions on the targeted children, those who witnessed the posts, as well as the parents, teachers, counselors, and administrators who had to manage the fallout. While the District acknowledges that regulating off-campus speech is primarily a parental responsibility, it argues that when such speech creates a substantial disruption and involves severe bullying or threats, the District is authorized to intervene to maintain a conducive educational environment and ensure student safety.

Examining the facts presented, it becomes apparent that the Plaintiff falls short of meeting the necessary requirements. The First Amendment claim is unlikely to succeed, as the Plaintiff

fails to provide evidence that there was not a substantial disruption to the educational environment and also fails to assert a showing that Plaintiff's rights were violated. Further, Plaintiff fails to provide sufficient evidence of immediate irreparable harm or to show that this alleged harm is greater than the potential injury to the District. Moreover, there is a lack of support for the argument that granting the Temporary Restraining Order (TRO) would not disserve the public interest. Consequently, the Plaintiff's request for a TRO should be denied based on these inadequacies.

## II. STATEMENT OF FACTS

Defendants incorporate by reference all verified factual allegations made in the affidavit from Defendant and Principal of Durham Intermediate School, Whitney Wheeler attached hereto as Exhibit A and incorporated herein by reference:

On Friday, October 27, 2023, a DAEP placement hearing was held for M.F. at Durham Intermediate School at 12:30 p.m. *See* Wheeler Aff., ¶ 1; *see also* Brief ISO Ptf.'s Mot. for TRO at pgs. 7-8. Present were Principal Whitney Wheeler, Assistant Principal Kim Ray, SRO Wormley, Counsel for the District Katie Pestcoe, M.F., his mother, Katherine Fisher, his father Michael Fisher, his grandfather Michael Fisher, and their attorney, Griffin Rubin. *See* Wheeler Aff. at ¶ 1; *see also* Brief ISO Ptf.'s Mot. for TRO at pgs. 7-8. During the course of this hearing, the District presented the evidence obtained in investigating a bullying/cyberbullying incident that was the subject of this disciplinary hearing. *See* Wheeler Aff. at ¶ 1; *see also* Brief ISO Ptf.'s Mot. for TRO at pgs. 7-8. Thereafter, M.F. was provided with the opportunity to present his case. During his presentation, M.F. was presented with two screenshots of posts on a fake TikTok account that included images of two other students, Minor #1 and Minor #2, with writing over top of the images asserting vulgar claims about the students depicted. *See* Wheeler Aff. at ¶ 1; *see also* Brief ISO

Ptf.'s Mot. for TRO at pgs. 7-8.

The first post was a picture of Minor #1 with the statement "[Minor #1] sucks at sports and is so ugly. He meatrides [student] amd nobody likes him. he is super dumb and as smart as [student]which isnt saying much. His ugly side [p]art looks terrible and idk how he pulled [student] but seeing as how [student] looks im not surprised she said yes". *See* Wheeler Aff. at ¶ 4; *see also* Ptf.'s Brief ISO Ptf.'s Mot. for TRO at pgs. 3-4. The second post was an image of Minor #2 with the statement, "[Minor #2] is a very fat girl and struggles to hold her self back from the buffet she breaks down walls to get to a buffet table and she likes [student] and the only person she has managed to pull is [student] shes so bad at volleyball but it makes sense because shes so fat she cant move around [Minor #2] is as chubby as a bean bag she talks crap about everyone and she said [student] isa stupid curry muncher who makes out with her fake bf [Minor #2] is the roumor queen". *See* Wheeler Aff. at ¶ 6.

M.F. admitted to creating the image, writing the statements, making the post of Minor #1, and making a post about himself. *See* Wheeler Aff. at ¶ 1; *see also* Brief ISO Ptf.'s Mot. for TRO at pgs. 3-4. Additionally, he admitted that while he did not create the image or write the statements related to Minor #2, he was present when they were created and they were posted from the same account on his personal phone. It was confirmed at this hearing that these posts were made from this TikTok account on Friday, October 20, 2023, in the after-school evening hours. *See* Wheeler Aff. at ¶ 1.

The campus was not made aware of this account nor any issues or incidents relating to it until Monday, October 23, 2023. *Id.* at ¶¶ 2-5. On Monday, at approximately 8:30am, the front office was contacted by a concerned parent regarding the posts. *Id.* Specifically, the parent shared that the mother of Minor #2 would be reaching out with further detail but that there was concern

about Minor #2 not wanting to come to school. *Id*. The concerned parent asked that administration check on Minor #2 throughout the day. *Id.* At this point, the District was still unaware of the specific incidents that occurred on social media over the weekend and did not have knowledge that this parent's concern for Minor #2 was related to this incident. *Id*.

Throughout the morning of Monday, October 23, 2023, more information was received regarding the TikTok account and statements made about students therein. Several students approached administrators about it in the halls and cafeteria and asked questions regarding the content and creation of the posts and whether the District knew about it; virtually the entire 6th grade was in an uproar regarding the posts—attempting to determine who created them and placing blame on one another. *Id*. at ¶¶ 5, 7. As the day went on, the district became aware that students were discussing the posts in a group text message, threatening suicide and even encouraging suicide; the interest in and discussion and furor over the posts reached a point where teachers were having a difficult time effectively educating due to the disruptive nature of students being physically and emotionally affected by the TikTok posts. *Id.* at ¶¶ 7-18. As more parents became aware of the posts from their students, parents became outraged and began calling the school, bringing copies of postings from student group chats and social media accounts, threatening administrators, and demanding that meetings be scheduled to discuss the posts. *Id.* at ¶¶ 19-26.

While all of this was going on, a separate police investigation was being conducted by the School's student resource officer ("SRO"), Southlake Police Department Officer Wormley, unbeknownst to the District, as parents of a student in the District had filed a formal complaint against Plaintiff and another student for identity theft charges, as the TikTok account falsely purported to be owned by their student. *See Id.* at ¶¶ 10-14; *see also* Brief ISO Ptf.'s Mot. for TRO at pgs. 4-6. It is Ms. Wheeler's understanding that, following the filing of this complaint, the local

Southlake Police Department instructed their officer, SRO Wormley, to conduct an investigation at the school to investigate these claims. In the course of his investigation, Officer Wormley interviewed students including the Plaintiff, who eventually signed a statement admitting creating some of the posts. *See* Wheeler Aff. at ¶¶ 8, 10-14.

Due to the ongoing substantial disruption to the educational process and the conclusion by the district that the statements constituted threats, bullying, and cyberbullying, the District began its own investigation. *See Id.* at ¶¶ 7-18. The District, immediately upon commencing its investigation, placed M.F. on out-of-school suspension. *Id.* at ¶ 30; *see also* Brief ISO Ptf.'s Mot. for TRO at pg. 6. Following the conclusion of the investigation, the DAEP hearing was held on October 27, 2023. M.F. was assigned to DAEP for 45 days (the minimum sentence for a DAEP placement) with a review at 33 days (which is the final day of the semester). *See* Brief ISO Ptf.'s Mot. for TRO at pgs. 7-8; *see also* Wheeler Aff. at ¶¶ 1, 30-31.  Following receipt of the DAEP placement decision, the family immediately filed suit against the District and now moves for this emergency hearing and TRO.

### III. LEGAL STANDARD

A temporary restraining order ("TRO") is an "extraordinary remedy." *Williams v. Logan*, No. 3:22-cv-02877, 2023 U.S. Dist. LEXIS 122979, at *4 (N.D. Tex. June 5, 2023). "A TRO is 'simply a highly accelerated and temporary form of preliminary injunctive relief,' which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (citation omitted).

To obtain a TRO or preliminary injunction, a plaintiff must establish the following elements by a preponderance of the evidence: (1) there is a substantial likelihood of success on the

merits; (2) there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting the preliminary injunction will not disserve the public interest. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

## IV. ARGUMENT AND AUTHORITIES

In his Brief in Support of Plaintiff's Emergency Motion for TRO and Request for Emergency Hearing, Plaintiff claims he meets the each of the requirements necessary to obtain a TRO. However, neither the law nor the evidence supports that argument. Plaintiff fails to establish each required element necessary to be granted a TRO. First Plaintiff is unlikely to succeed on the merits of his First Amendment claims as there was, and continues to be, an immediate and substantial disruption to school activities and the educational process. Second, there is not sufficient evidence to show that Plaintiff will suffer irreparable harm absent immediate injunctive relief. Rather, there is evidence to show that Plaintiff failed to exhaust all administrative remedies, including filing an appeal of the disciplinary placement. Additionally, in the Original Complaint filed in conjunction with this Motion for TRO, Plaintiff requests damages, thereby asserting that there is a remedy at law to this alleged harm. Third, the threatened "injury" to the Plaintiff does not outweigh the ongoing substantial disruption and potential harm to the District as there is significantly more at stake here for the District and its employees than a student having to serve a little over a month in a district alternative educational program ("DAEP") as a disciplinary consequence for engaging in bullying—that he admitted to—that had the effect of creating a substantial disruption to the educational process and functionality of the entire District. Finally, allowing parents to bypass internal disciplinary procedures and decisions to obtain a decision from a judge is a disservice to the public interest and judicial process as a whole; as is overturning or

6

ruling as "overly broad" a policy modeled after precedent set forth by the United States Supreme Court and interpreted as law by a majority (if not all) school districts nationwide. The Plaintiff has failed to meet the burden necessary to be granted a TRO, therefore his request should be denied.

**A. Plaintiff M.F. Is Unlikely to Succeed on the Merits of His First Amendment Claims.**

Plaintiff is unlikely to succeed on the merits of his First Amendment claims for three main reasons. First, the District's policy aligns with established legal precedent, specifically referencing *Mahanoy*[1] and *Tinker*[2]. This alignment not only adheres to United States Supreme Court guidance, but also highlights the appropriate response for instances where the District experiences the presence of a substantial disruption based on the off-campus bullying speech of Plaintiff, as has occurred here. Second, the three First Amendment claims brought by Plaintiff are addressed systematically. The argument that public schools cannot discipline students for off-campus speech lacking a substantial material disruption contradicts the facts set forth herein that show that the District enacted discipline as a reaction to a substantial disruption and in accordance with the law. Additionally, the contention that public schools lack the authority to penalize students based on the content of their off-campus speech is challenged by the *Tinker* and *Mahanoy* decisions which set forth circumstances—including when the speech is considered bullying that creates a threat to students and substantial disruption to the school—where the District is authorized to act. Finally, the Plaintiff's claim that the District's code of conduct is overbroad and grants excessive discretion for censoring student speech is disputed as the language set forth in the code of conduct mirrors the legal precedent set forth in *Mahanoy* and *Tinker* described more fully below. It is for each of these reasons that the Plaintiff is unlikely to succeed on the merits of his First Amendment claims and therefore does not meet his burden necessary to obtain a TRO.

---

[1] *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2044-2045 (2021).
[2] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

7

i.   **Public schools can regulate and enact appropriate discipline for off-campus student speech that causes a substantial disruption to the educational process.**

Defendants do not dispute that students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2044 (2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)); *see Tinker*, 393 U.S. at 511 ("School officials do not possess absolute authority over their students."). However, the District asserts—and Supreme Court precedent agrees—that in limited instances, when student speech materially disrupts classwork or involves substantial disorder or invasion of the rights of others, the District has every right to intervene. *See Mahanoy*, 141 S. Ct. at 2045; *see also Tinker*, 393 U.S. at 513.

Plaintiff's argument that the District inappropriately disciplined him stems from the fact that the initial post or speech itself was made off-campus when the student was under the disciplinary authority of his parents. The Plaintiff therefore asserted that, in this moment, the school district was not standing *in loco parentis*. What Plaintiff fails to account for, and rather, seems to blatantly ignore, is the immediate disruption and substantial chaos that ensued starting the very next school day after these posts were made, and the profoundly negative impact this speech had on those targeted by the hateful words, as well as other classmates who became involved as screenshots of the hateful speech continued to be spread across campus.

Plaintiff claims that "there was no basis for Defendants to believe M.F.'s posts would affect school activities—let alone the substantial, material disruption required by *Mahanoy*." This is simply not correct. The speech occurred on the evening of Friday, October 20, 2023, after school hours. Monday morning, the school had not yet been made aware of the events that had occurred over the weekend following the post made by Plaintiff. However, as early as mid-morning on that day, the District began to receive emails and calls from concerned parents.  It was this interest and eventual

8

disruption of school activities that precipitated the investigation.

The District began receiving calls and emails from parents regarding the safety of their students on Monday, October 23, 2023.  *See* Wheeler Aff. At ¶¶ 2-5, 7-18. Additionally, parents began coming to the school in waves to drop off "evidence" of what had occurred on social media over the weekend; several students asked to see counselors; others were afraid to come to school; the District was made aware of threats students were making to other students telling them to kill themselves and also of posts made by students alleging mental distress and the desire to commit suicide. *Id*. Further, classes were disrupted by constant student conversation about these posts and the ongoing discussion via text message about same; students asking to go to the office; internal fighting between students threatening each other not to "narc" about what happened. *Id*. It was only at this point, when the District became aware of alleged bullying and cyberbullying that was creating an extreme, immediate, and substantial disruption to the overall educational process, that they opened an investigation into the incident and began to take action. *Id*. at ¶¶ 7-18.

Plaintiff concedes that the Supreme Court has ruled that schools are entitled to regulate off-campus speech when it creates a substantial and material disruption to the educational environment. *See* Ptf's Brief in Support of Mot. for TRO at pgs. 9-10. The facts here precisely align with that principle. Unlike the situation in *Tinker* where the school district took action in anticipation of a potential disruption, the District's response was triggered by the tangible and substantial disruption caused directly by the Plaintiff's post(s). *See Tinker*, 393 U.S. at 508-09. The disruption reached a level where the District's regular operations were severely impacted, prompting the District to intervene. Consequently, the District's actions are in line with the established precedent set forth by the United States Supreme Court.

ii.     **Public schools have been granted the authority to regulate off-campus speech in limited circumstances, including when there is a substantial disruption to the educational process and when the speech constitutes severe bullying, harassment, or threatens students.**

9

Plaintiff alleges that M.F. was punished because his words may have "caused offense", not because he disrupted school activities. This is simply false. In his arguments, Plaintiff relies heavily on the decision set forth in the *Mahanoy* case, stating that the District's authority to "regulate M.F.'s speech is at least minimal, if not completely absent." However, he fails to mention that the court in *Mahanoy* held that the school's regulatory interests remain significant in some off-campus circumstances, listing instances where off-campus behavior may call for school regulation, including, instances of severe bullying or harassment targeting particular individuals, and threats aimed at students. *See Mahanoy*, 141 S. Ct. at 2045. M.F.'s post(s) were directed at individuals—specifically Minor #1 and Minor #2—and were objectively threatening and constituted bullying.

As is discussed herein, Plaintiff's off-campus speech included social media posts made as a part of a TikTok trend[3] where pictures of other children were posted along with words saying vile things about them and encouraging other viewers to join in on "bashing" them. In the District's Student Code of Conduct and Administrative Policy FFI(LEGAL), "bullying" (which also includes "cyberbullying") is defined as a single significant act or a pattern of acts by one or more students directed at another student that exploits and imbalance of power and involves engaging in written or verbal expression, expression through electronic means, or physical conduct that: (1) has the effect or will have the effect of placing a student in reasonable fear of harm to the student or damage to the student's property; (2) is sufficiently severe, persistent, or pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student; (3) materially and substantially disrupts the educational process or the orderly operation of a classroom or school; or

---

[3] The TikTok posts made were tagged as being a part of the "Lala Bop" trend, which is a slang term on TikTok to describe a tween or teen girl (or in this case girl or boy) who has had sex (or engaged in sexual acts) with multiple people. The term is used in videos to slut-shame girls (or boys) and videos are often posted along with photos of the person in order to harass or bully them for dating around or being promiscuous. *See https://tinybeans.com/what-is-lala-bop-tiktok-trend/#:~:text=A%20%E2%80%9Clala%20bop%E2%80%9D%20is%20a,dating%20around%20or%20being%20promiscuous.*

(4) infringes on the rights of the victim at school.

In this particular situation, although the social media posts were only active for a brief period, their impact was far-reaching. Almost instantly screenshotted, these posts took on a perpetual existence. In the ensuing hours and days, the content spread among students and parents giving rise to fear, emotional turmoil, and widespread outrage. This dissemination extended to other forms of communication, thus amplifying the negativity.[4]

As the school days unfolded following the initial posts, a palpable atmosphere of fear pervaded. Students hesitated to attend school, sought solace from counselors, teachers, and members of the administration, while teachers struggled to maintain control in classrooms dominated by the pervasive influence of these posts. The situation escalated to the point where students resorted to threatening one another through group text messages, using phrases as extreme as "kill yourself". Disturbingly, some students even expressed threats of self-harm, contributing to a heightened state of crisis and disruption throughout the District. The influx of parental concern and outrage further compounded the challenges, nearly bringing regular District operation to a standstill.

In response to the persistent disruption affecting the District, its classes, and activities, District Administration initiated an investigation into the incident and the statements made by Plaintiff. Considering the profound impact on students and the educational environment, the District concluded that the posts amounted to severe—bordering on vile—bullying and cyberbullying, causing a substantial disruption to the educational process. Moreover, these actions fell within the defined "special characteristic" of off-campus speech found in *Mahanoy*, encompassing severe bullying, harassment, and threats to students, thereby justifying the District's lawful intervention and disciplinary measures in accordance with policy and state law. Contrary to the Plaintiff's assertion that the discipline was based solely on the potential for offense, the truth is far from it. The District faced

---

[4] Please note, the District knew nothing about the posts in question until after they were purportedly removed, thus proving that they continue to be both accessible and problematic in creating a substantial disruption to the District.

an immeasurable disruption, with students' lives and well-being put at risk due to the scope and nature of Plaintiff's statements. Consequently, the Plaintiff's claim, suggesting discipline solely for causing offense, lacks merit given the substantial disruption and potential harm caused by his actions.

iii.     **The District's Student Code of Conduct is consistent with federal law and provides a clear explanation of the instances when the District is permitted by law to use its discretion in regulating and disciplining certain off-campus speech.**

Plaintiff makes several claims that the District's Student Code of Conduct ("SCOC") contains vague, overbroad prohibitions on speech that purport to give school administrators unlimited power to regulate student speech without any objective criteria to limit their discretion. This claim is, once again, a stretch of the imagination by Plaintiff in an attempt to find an argument that sticks. He again fails to meet his burden.

The language found in the District's student code of conduct is identical to the language found not only in legal precedent set forth by the United States Supreme Court, but also in model policies FFI(LEGAL) and FNA(LEGAL) utilized by a majority of school districts across Texas. *See* Model Policy FFI(LEGAL) at FFI(LEGAL); *see also* model policy FNA(LEGAL) at FNA(LEGAL). These model policies are likely adopted or recreated and utilized by a majority of the 1,207 school districts throughout the State of Texas. The Plaintiff likens the situation at hand to several examples of school Districts or District employees regulating the off-campus political opinions of students. These bizarre examples are hardly comparable to the posts here.[5] The District's policies described in the SCOC do not authorize administrators to regulate speech in any instance whatsoever. Rather, they authorize administrators to act when there is a substantial disruption to the educational environment. The District's SCOC clearly states that "[s]tudents are prohibited from sending or posting electronic

---

[5] The two outrageous examples to which Plaintiff directs the court as evidence of how school districts should over-step their bounds are clearly political speech and have inherent heightened protections. More analogous would be someone opposed to the Israel conflict directing harmful slurs at Jewish students, thus constituting bullying in violation of district policies, and likely substantially disrupting district activities and the educational process.

messages while on school property that are abusive, obscene, sexually oriented, threatening, harassing, damaging to another's reputation, or illegal." *See* Carroll ISD 2023-24 Student Code of Conduct, available at 2023-2023 Student Code of Conduct.

The SCOC unequivocally established that the prohibition of certain conduct, including cyberbullying, extends to off-campus speech if "it results in a material or substantial disruption to the educational environment or is reasonably forecast to cause one, as allowed by law." *Id*. This statement explicitly defers to the legal principles outlined in *Tinker*, which were later reiterated in *Mahanoy*. The District is thereby empowered to investigate and discipline off-campus student speech, provided it causes a material or substantial disruption, or is reasonably anticipated to do so, to the extent provided by law, or it is considered severe bullying or threats targeted at other students.

*Tinker's* precedent reinforces this authority, emphasizing that "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *See Tinker*, 393 U.S. at 513; *see also Mahanoy*, 141 S. Ct. 2045. This principle, articulated in *Tinker* and reaffirmed in *Mahanoy*, forms the basis for the District's right to address and take action against off-campus speech causing a substantial disruption.

The District's SCOC meticulously aligns with legal guidelines and established precedent for the regulation of off-campus speech. Asserting that the SCOC is "overbroad" or affords an "impermissible amount of discretion" for the "censorship" of student speech essentially undermines the significance of legal precedents set by the United States Supreme Court. Such a stance implies that individuals adhering strictly to the law can still face punishment, challenging the very essence of established legal principles.

A decision in favor of labeling the SCOC as overbroad or discretionary would not only be inconsistent with the law but also detrimental to the broader interests of public schools and the judicial

system as a whole. It risks compromising the integrity of the legal framework and could set an unfavorable precedent for the effective functioning of both educational institutions and the judicial system.

**B.      Absent injunctive relief, Plaintiff M.F. will not suffer irreparable harm.**

Plaintiff's claim of irreparable harm hinges on the assertion that his First Amendment rights have been violated, yet the established legal framework contradicts this argument. Plaintiff first alleges that the loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury. However, as set forth in *Mahanoy*, off-campus speech causing substantial disruption and involving serious bullying or threats is not considered protected speech, thus rendering this argument moot. *See Mahanoy*, 141 S. Ct. at 2045.

Further, plaintiff claims that M.F. is barred from the school of his choosing as punishment for his protected self-expression. Although students are granted an undeniable property interest in a state-provided education, they are not entitled to attend the school of their choosing. *Goss v. Lopez*, 419 U.S. 565, 574 (1975). It is well-settled that transferring a student from regular classes to DAEP does not impact a protected property or liberty interest because it does not deny the student access to public education. *Nevares v. San Marcos Indep. Sch. Dist.*, 111 F.3d 25, 26-27 (5th Cir. 1997). The temporary nature of the placement, set to conclude at the end of the semester, further minimizes the potential negative impact on the Plaintiff's educational experience.

Crucially, it is important to note that the Plaintiff has failed to exhaust his administrative remedies, bypassing the appeal process offered by the District. The absence of engagement in this process undermines the claim of irreparable harm, as the established appeal mechanism allows for a comprehensive review and resolution of disputes.

More specifically, as a part of the DAEP Placement Notice sent to Plaintiff on October 29,

14

2023, the parents were informed that if they were dissatisfied with the result of the placement conference, they could appeal to the District's Director of Safety and Student Services. When an appeal is filed, it follows the District's Grievance Policy (FNG(LOCAL)) beginning at a Level I Complaint, which is then heard by an administrator who conducts another investigation and issues a decision within 10 business days. If the parents still disagree with the outcome, they can continue to appeal the decision up through Level III where the Board will hear the arguments and issue a decision. Following receipt of the Board's decision, should the parents still disagree, they are able to appeal the decision to the Texas Commissioner of Education who will review the record, and issue a decision. The Plaintiff has not engaged in any of these steps to attempt to resolve this issue, further showing that the alleged "harm" is not irreparable.

In essence, the lack of a violation of Plaintiff's First Amendment rights, Plaintiff's failure to explore administrative avenues, and the pursuit of damages undermines the argument for irreparable harm, rendering the request for a TRO unwarranted.

**C.    The threated "injury" to the Plaintiff of being required to serve a few weeks in DAEP as discipline pursuant to District policy does not outweigh the harm the Defendants have faced and continue to face.**

As has been described herein, the District has been impeded in its ability to effectively operate and educate students beginning the first day school opened following the publishing of these social media posts by Plaintiff. The Disruption to the educational setting that directly resulted from the creation of the TikTok account and posts made therein, has been a blow to the District in more ways than one.

First, it has created a substantial and material disruption to students, teachers, the administration, and classroom functioning, necessitating an investigation and the imposition of disciplinary measures. *See* Wheeler Aff. at ¶¶ 7-18. However, the disruption has not abated; in

fact, it has intensified in the days following the disciplinary conference. Parents, expressing dissatisfaction with what they perceive as insufficient accountability for bullying actions, continue to persistently seek meetings with administrators, send threatening emails and texts, and advocate for the termination of all implicated members of campus and District-level administrators. *Id.*

Additionally, failure of the District to act in accordance with the law as set forth by the Supreme Court and in response to incidents of severe bullying, could result in a violation of Texas State Law. Texas Education Code Section 37.0832, also known as "David's Law", sets forth procedures for school districts with regard to bullying, including authorizing district employees to remove students from class and place them in DAEP if they encourage a student to commit or attempt to commit suicide, or incite violence against a student through group bullying. Because the posts at issue resulted in encouragement for the targeted students to commit suicide and incite violence against students through group bullying, the District had an obligation to act.

Delaying disciplinary action concerning the Plaintiff and the described incident not only poses potential harm to the Plaintiff himself as well as the District, but also jeopardizes the trust of students and the community in the District's administration to safeguard and serve its students. The repercussions of such a delay could extend to irreparable consequences, impacting the overall confidence in the District's ability to ensure the well-being of its student body.

**D.     Public interest favors supporting District administration and local policies when they are in compliance with the law.**

Public interest generally weighs in favor of the court abstaining from interfering with school districts' internal disciplinary decisions. The courts have held that citizens are disserved when federal judges substitute their notions of fairness in place of officials put in place to make these kinds of policy decisions and judgment calls. *Khan v. Fort Bend Indep. Sch. Dist.*, 561 F.Supp.2d 760 (S.D. TX 2008) *citing Kahara Bodas Co.*, 335 F.3d at 363.

16

Further, based on the Supreme Court precedent set forth in *Tinker* and reiterated in *Mahanoy*, public school districts have created and consistently utilize the aforementioned model board policies FFI(LEGAL) and FNA(LEGAL) which set forth the specific instances where school districts are granted authority to regulate off campus speech and bullying. Hundreds if not thousands of school districts across Texas and nationwide have implemented these and similar policies on the notion that the Supreme Court's rulings on these matters are law which should be followed. Clearly public interest is disserved should the court disallow the enforcement of these policies based on law.

The Plaintiff contends that public interest lies in preventing the violation of constitutional rights. However, M.F.'s constitutional rights remain intact, as the District has adhered to its policies. The court's interference in this local-level disciplinary issue would not only render District-level policies and procedures futile but also diminish the significance of Supreme Court precedent. Establishing a precedent where students or parents can circumvent the District's policies, resort to federal court, and obtain a direct ruling from a judge would be detrimental to both the District and the judicial system, creating a disservice and an undue burden.

## V. CONCLUSION AND PRAYER

The Plaintiff has failed to establish each of the elements necessary to entitle him to injunctive relief. Therefore, Plaintiff's request should be denied.

WHEREFORE, PREMISES CONSIDERED, Defendants Carroll Independent School District, Whitney Wheeler, and Kim Ray respectfully pray that this Court deny Plaintiff's Emergency Motion for TRO and Request for Emergency Hearing. Defendants request all such other and further relief, whether general or special, at law or in equity, to which Defendants may be justly entitled.

17

s

Respectfully submitted,

_____

Thomas J. Fisher
    State Bar No. 07064500
Katie J. Pestcoe
    State Bar No. 24125643
LEASOR CRASS, P.C.
302 W. Broad Street
Mansfield, Texas 76063
(682) 422-0009 Telephone
(682) 422-0008 Facsimile
tommy@leasorcrass.com
katie@leasorcrass.com

**ATTORNEYS FOR DEFENDANTS
CARROLL INDEPENDENT SCHOOL DISTRICT,
WHITNEY WHEELER, AND KIM RAY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2, 2023, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I further certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


**SBAITI & COMPANY PLLC**
**Mazin A. Sbaiti**
Texas Bar No. 24058096
mas@sbaitilaw.com
**Griffin S. Rubin**
Texas Bar No. 24121809
gsr@sbaitilaw.com
Dallas Arts Tower
2200 Ross Ave., Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367


**ATTORNEYS FOR PLAINTIFF**

_____
Thomas J. Fisher

19