**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **M.F., a minor, by and through his father, MICHAEL FISHER, and his mother, KATHERINE FISHER,** | § § § § | |
| **Plaintiff,** | § § | **Civil Action No. 4:23-cv-01102-O** |
| **v.** | § § | |
| **CARROLL INDEPENDENT SCHOOL DISTRICT, WHITNEY WHEELER, in her individual capacity and capacity as Principal of Durham Intermediate School, AND KIM RAY, in her individual capacity and capacity as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School,** | § § § § § § § § § § § § | |
| **Defendants.** | § § | |

## ORDER

Before the Court are Plaintiff's Emergency Motion for Temporary Restraining Order and Request for Emergency Hearing (ECF No. 4) and Brief in Support (ECF No. 5), filed on October 30, 2023; Defendants' Response in Opposition to Plaintiff's Emergency Motion (ECF No. 8), filed on November 2, 2023; Plaintiff's Reply in Support of Emergency Motion for TRO (ECF No. 11) and Appendix in Support (ECF No. 12), filed on November 3, 2023. For the reasons stated below, the Court temporarily **ENJOINS** Defendants—along with their officers, agents, servants, and employees—from continuing to punish M.F. for his protected off-campus, out-of-school speech. Further, the Court temporarily **DIRECTS** Defendants—along with their officers, agents, servants, and employees—to immediately reinstate M.F. at Durham Intermediate School. The Court sets this matter for hearing on **November 16, 2023 at 9:00 a.m.**

1

## I.     BACKGROUND[1]

This case involves an eleven-year-old child ("Plaintiff" or "M.F.") who made offensive posts on TikTok, a social media platform. M.F. is a student at Durham Intermediate School ("Durham"), which is a public school for fifth and sixth graders in the Carroll Independent School District (the "District").[2] Durham is run by its principal, Whitney Wheeler ("Wheeler"), with support from the assistant principal, Kim Ray ("Ray"). The school also has a uniformed student resource officer from the Southlake Police Department ("SRO Wormley").

### A.  The TikTok Posts

About three months ago, M.F. and several other students were involved in the creation of a shared account on the social media platform TikTok.[3] Over the past four weeks, M.F. and another individual in his extended friend group (Minor #1) have engaged in a cycle of mean-spirited exchanges.[4]

On Friday, October 20, 2023, M.F. visited the house of his friend ("Minor #3") outside of school hours. At or around 6:00 p.m. that evening, several posts were made on the shared TikTok account. One post contained a picture of Minor #1 with the statement:

> [Minor #1] sucks at sports and is so ugly. He meatrides [student] amd nobody likes
> him. he is super dumb and as smart as [student] which isnt saying much. His ugly
> side [p]art looks terrible and idk how he pulled [student] but seeing as how [student]
> looks im not surprised she said yes.[5]

---

[1] Unless otherwise noted, the Court's recitation of facts is taken from Defendants' Response in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order (ECF No. 8), which includes Principal Whitney Wheeler's affidavit (ECF No. 8-1).

[2] Pl.'s Br. in Supp. of Emergency Mot. for TRO 3, ECF No. 5.

[3] *Id.*

[4] *Id.* Although Plaintiff refers to this student as "Minor #2," the Court adopts the Defendant's reference to this student as "Minor #1."

[5] The Court does not denote the numerous spelling and grammatical errors in this post.

M.F. created and published this post about Minor #1. Additionally, M.F. also admitted to making a post about himself. Like the post about Minor #1, M.F.'s post about himself contained his own picture with self-denigrating text overlaying the image.[6] These two posts appear to be the only ones M.F. created and published on the shared TikTok account in the weeks since its creation. Although there was an additional post featured an image of Minor #2,[7] there appears to be no dispute that M.F. was not responsible for this speech.[8] At or around 8:30 p.m. that same Friday evening, M.F. took down his posts.

### B. Response to the TikTok Posts

The weekend came and went by the time Defendants were made aware of the shared TikTok account and the incidents relating to it. On Monday, October 23, 2023, Durham's front office was contacted by a concerned parent regarding the TikTok posts. The parent mentioned that Minor #2 did not want to attend school that day. Over the course of the day, Defendants received more information about the TikTok account and its since-deleted posts from several students who approached Durham administrators as well as other parents who called the school in outrage. Eventually, Defendants acquired copies of the original postings reshared in student group chats. Wheeler characterized Durham's 6th grade section as "a buzz," leading to multiple student conversations, finger pointing, commotion in the hallways, distraction during class sessions, and

---

[6] Pl.'s Br. in Supp. of Emergency Mot. for TRO 3, ECF No. 5.

[7] The post about Minor #2 similarly contained an image with the following statement: "[Minor #2] is a very fat girl and struggles to hold her self back from the buffet she breaks down walls to get to a buffet table and she likes [student] and the only person she has managed to pull is [student] shes so bad at volleyball but it makes sense because shes so fat she cant move around [Minor #2] is as chubby as a bean bag she talks crap about everyone and she said [student] isa stupid curry muncher who makes out with her fake bf [Minor #2] is the roumor queen." Once again, the Court does not denote the numerous spelling and grammatical errors in this post.

[8] *Compare* Pl.'s Reply Br. in Supp. of Emergency Mot. for TRO 1, ECF No. 11 ("[I]t is uncontroverted that M.F. did not create or public the post regarding Minor #2.") *with* Def.'s Resp. to Pl.'s Br. in Supp. of Emergency Mot. for TRO 3, ECF No. 8 (noting, without disputing, that M.F. "admitted that . . . he did not create the image or write the statement related to Minor #2").

3

concerns about the well-being of various students. Much of this disruption was in response to Minor #3's post (about Minor #2), Minor #3's past behavior, and parent criticism regarding the District's allegedly soft approach to bullying.

While all of this was occurring on Monday, SRO Wormley initiated a police investigation after the parents of the student whose picture was used on the TikTok account filed a formal complaint. SRO Wormley's investigation of this complaint included interviewing multiple students throughout the school day. Concerned that the posts could potentially be interpreted as bullying, cyberbullying, and/or harassment of Durham students, the District also commenced its own investigation. By Tuesday, October 24, 2023, M.F. was pulled out of class by SRO Wormley. Once alone in an office with the door shut, SRO Wormley questioned M.F. regarding the shared TikTok account.[9] M.F. denied involvement.[10]

Roughly an hour later, SRO Wormley pulled M.F. out of another class for more questioning.[11] This time, with the door open, SRO Wormley demanded to know whether M.F. created the posts on the shared TikTok account from the previous Friday.[12] M.F. again denied involvement and SRO Wormley released M.F. to return to class.[13] But approximately half an hour later, SRO Wormley pulled M.F. from class again and took M.F. back to his office.[14] This time, Minor #3 was already in the office.[15] SRO Wormley questioned M.F. for a third time, demanding to know of his involvement with the Friday posts on the shared TikTok account.[16] This time, however, Minor #3 was also present. Eventually, both boys admitted to posting on the shared

---

[9] Pl.'s Br. in Supp. of Emergency Mot. for TRO 4, ECF No. 5.
[10] *Id.*
[11] *Id.*
[12] *Id.* at 4–5.
[13] *Id.* at 5.
[14] *Id.*
[15] *Id.*
[16] *Id.*

TikTok account. Soon after, SRO Wormley notified Ray that he had two boys in his office that admitted to making the TikTok posts. After Ray arrived, she walked the boys to the main office suite and separated them into different rooms.[17] M.F. was placed in Ray's office.[18] While there, Ray instructed M.F. to write a statement about his involvement in the posts made on the shared TikTok account. Wheeler eventually arrived and asked clarifying questions about M.F.'s statement. One of these questions was whether M.F. used his personal device for the posts, which M.F. confirmed.

It was only after all of this transpired that the District finally called M.F.'s parents about the situation.[19] Ray informed M.F.'s mother that M.F. had been involved in some posts made on the shared TikTok account and that M.F. was to serve an out-of-school suspension for three days until the District could conduct an investigation.[20] This was the first instance that M.F.'s parents learned of the situation, including the investigation and questioning of their son.[21] When M.F.'s mother arrived at Durham to pick up M.F., Ray informed her that the District was contemplating whether to place M.F. in the District's Disciplinary Alternative Education Program ("DAEP") for purported violations of the District's Student Handbook and Code of Conduct (the "Code of Conduct").[22] When asked by M.F.'s mother how long any such DAEP placement would be, Ray told her one to six weeks.[23] The next day, SRO Wormley called M.F.'s mother to ask if she had any questions about the situation.[24] During their conversation, SRO Wormley told her that serving

---

[17] *Id.*
[18] *Id.*
[19] *Id.* at 5–6.
[20] *Id.* at 6.
[21] *Id.*
[22] *Id*
[23] *Id.*
[24] *Id.*

a three-day suspension would be sufficient in most cases, but acknowledged that the situation in this District might be different due to heightened levels of parent involvement.[25]

### C.  The DAEP Hearing

Following the conclusion of the District's investigation, M.F.'s parents received correspondence that there would be a hearing scheduled to discuss M.F.'s purported wrongdoings and placement in DAEP.[26] That hearing took place at Durham on Friday, October 27, 2023 at 12:30 p.m. Multiple people were present at the hearing. Wheeler, Ray, SRO Wormley, and counsel for the District, Katie Pestcoe, appeared for the District. Attendees on behalf of M.F. were his parents, his grandfather, and his attorney, Griffin Rubin. At the hearing, the District first presented evidence obtained from their investigation of the alleged bullying incident. Thereafter, M.F. was provided with an opportunity to present his case.

During the hearing, M.F. was presented with screenshots of the TikTok posts containing images of Minor #1 and Minor #2. Each post contained writing over the top of the images asserting vulgar claims about the students depicted. M.F. admitted to creating the post of Minor #1. Additionally, M.F. admitted to making a post about himself. Despite these confessions, M.F. testified that he did not create the image or write the statements related to Minor #2 even though he was present when they were created and posted from his phone.

Before the meeting broke for further deliberations by the District, M.F.'s counsel directed Wheeler and Ray to various pages in the Code of Conduct listing the vast array of disciplinary actions the District permits.[27] The Code of Code listed DAEP as the second-most severe punishment aside from expulsion.[28] Wheeler and Ray were asked whether they considered any of

---

[25] *Id.*
[26] *Id.*
[27] *Id.* at 7.
[28] *Id.*

the other disciplinary actions for M.F. before choosing DAEP given M.F.'s excellent academic performance and absence of serious disciplinary infractions on his record.[29] At the end of the meeting, Ray informed the attendees that the District would deliberate and promptly render the District's disciplinary decision.[30] On Sunday, October 29, 2023, the District informed M.F.'s parents that M.F. must report to DAEP for a sentence of forty-five school days beginning on Monday, October 30, 2023.[31] In response to the District's disciplinary decision, Plaintiff now seeks a temporary restraining order ("TRO") that (1) enjoins Defendants from continuing to punish M.F. for his protected speech and (2) directs Defendants to immediately reinstate Plaintiff at Durham Intermediate School.

## II.   LEGAL STANDARD

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). The purpose of a TRO is "to preserve the status quo until there is an opportunity to hold a hearing." 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2951 (3d ed.). "A [temporary restraining order] is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F.Supp.3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (cleaned up). A court may issue a TRO if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v.*

---

[29] *Id.* at 7–8.
[30] *Id.* at 8.
[31] *Id.*

*Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, it is the party seeking relief who bears the burden of proving all four elements of the requested injunctive relief. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction or TRO "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an injunction or TRO must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

## III.    ANALYSIS

### A.  Substantial Likelihood of Success on the Merits[32]

To show a substantial likelihood of success on the merits, a plaintiff need not demonstrate that he is entitled to summary judgment on his claim but must instead present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. Plaintiff has met that burden at this stage to show that he is likely to succeed on the merits of the First Amendment claim: M.F.'s off-campus speech is beyond the school's supervisory orbit and his speech does not otherwise fall into the serious or

---

[32] In its analysis, the Court determines that Plaintiff is substantially likely to succeed on the merits of his first claim: that Defendant's punishment of M.F. violates the First Amendment of the United States Constitution and 42 U.S.C. § 1983. *See* Pl.'s Orig. & Verified Compl. 11, ECF No. 1 (Count I). Given this determination, the Court need not address Plaintiff's two remaining claims: that the Code of Conduct, on its face, violates both the First and Fourteenth Amendments. *See id.* at 12–14 (Counts II and III).

severe bullying and harassment exception. Therefore, Plaintiff has satisfied "arguably the most important" of the four factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

### 1. Student Speech

In *Tinker v. Des Moines Independent Commission School District*, the Supreme Court famously recognized that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. 503, 506 (1969). That is because "[s]chool officials do not possess absolute authority over their students." *Id.* at 511. Instead, the First Amendment operates as a limit on governmental authority to punish students for their speech. *Id.* at 506–09. Despite this lofty pronouncement, the Supreme Court cautioned that a public school student's free speech right is not without limits. *Id.* at 506. Rather, the "special characteristics of the school environment" imbue schools with a special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 506, 513. To meet this standard, a school "must demonstrate that the speech in question *actually caused*, or may reasonably be forecast to cause, a 'substantial disruption of or material interference with school activities.'" *McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1005 (5th Cir. 2023) (emphasis added) (quoting *id.* at 514). Satisfying this standard is no easy lift. *See Mahoney Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2048 (2021) (describing *Tinker*'s standard as "demanding").

When the student speech occurs off campus, "the strength of the unique educational characteristics that might call for special First Amendment leeway" is "diminish[ed]." *Id.* at 2046. Public schools retain limited authority to regulate speech "in some off-campus circumstances," but those situations are infrequent and generally relate directly to school activities and functions. *Id.* at 2044–45. Although the Supreme Court in *Mahanoy* did not provide detailed guidance as to when these off-campus circumstances might exist, the Court emphasized "three features of off-campus

speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech." *Id.* at 2046. Those features are (1) "a school, in relation to off-campus speech, will rarely stand *in loco parentis*"; (2) school regulation of off-campus student speech threatens to completely preclude students from exercising their free-speech rights; and (3) schools have an interest in protecting student expression, "especially when the expression takes place off campus." *Id.* Combined, "these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished." *Id.*

The *Mahanoy* framework is rooted in common sense and the longstanding Anglo–American tradition of *in loco parentis*. When parents "enroll[] [their] child in a public school, parents consent on behalf of the[ir] child to the relinquishment of some of the child's free-speech rights." *Id.* at 2051 (Alito, J., concurring). By impliedly consenting to "a public school's exercise of a degree of authority that is commensurate with the task that the parents ask the school to perform," parents authorize schools to act in place of the parent. *Id.* at 2052. But this does not mean there is "a complete transfer of parental authority over a student's speech." *Id.* at 2053. Rather, "parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children." *Id.* And because "[p]arents do not implicitly relinquish all that authority when they send their children to a public school," it is "far-fetched to suggest that enrollment implicitly confers the right to regulate what a child says or writes at all times of day and throughout the calendar year." *Id.* Indeed, the responsibility of school officials is secondary to the primary rights of parents. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").

### 2.   Protected v. Unprotected Off-Campus Speech

The *Mahanoy* Court declined to adopt a bright line rule for distinguishing between protected versus unprotected off-campus speech. 141 S.Ct. at 2045. In fact, the Supreme Court emphasized that its holding does "not now set forth a broad, highly general First Amendment rule stating just what counts as 'off campus' speech" and "whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent . . . substantial disruption of learning-related activities or the protection of those who make a school community." *Id.* at 2045. Instead, the Court noted that it "leave[s] for future cases to decide where, when, and how these features mean the speaker's off-campus location will make the critical difference." *Id.* at 2046. Applying those features here, the Court determines the location of M.F.'s speech plays a critical role. That means the District's authority to regulate M.F.'s off-campus speech is at best minimal, if not completely absent. This is enough to show a substantial likelihood of success on the merits of the First Amendment claim.

The first *Mahanoy* factor—that a school rarely stands *in loco parentis* for what happens off campus—cuts completely against the District's punishment of M.F.'s speech. It does not appear that the District was standing *in loco parentis* when M.F. engaged in the speech at issue. M.F. was off campus and using a private cell phone when he created and published his two posts. Similarly, M.F. was not on the District's property or at the site of any school-sponsored or school-related activity. M.F. even rescinded his speech that same evening by pulling it down shortly after posting. As a result, the speech never existed while Durham students were on campus and it was not connected to any off-campus school activity. Given these facts, it appears that M.F.'s off-campus speech "fall[s] within the zone of parental, rather than school-related, responsibility." *Id.* The District fails to provide contrary facts suggesting that M.F.'s "actual parents c[ould] not protect,

guide, and discipline" him for this speech. *Id.* Nor is there any evidence at this stage to suggest that M.F.'s parents delegated to school officials the ability to control M.F. while off-campus at Minor #3's house. Therefore, the Court finds that factor one weighs in favor of Plaintiff.

The second *Mahanoy* factor—the threat to students' ability to exercise off-campus free-speech rights—also cuts completely against the District's punishment of M.F.'s speech. M.F. was not at school, a school-sponsored event, or any other school function when he posted the speech at issue. The speech was made entirely outside of the District's supervisory orbit: on a Friday evening after the school week ended and at the start of the weekend. The Supreme Court has instructed that courts "must be more skeptical of . . . efforts to regulate off-campus speech" because students may otherwise be unable to engage in "[off-campus] speech at all." *Id.* That is because attempts to control "all the speech" children like M.F. "utter[] during the full 24-hour day" could have a chilling effect on the exercise of those students' First Amendment rights. *Id.* Given the timing of M.F.'s speech, the Court finds that the second factor also weighs in favor of Plaintiff.

The third *Mahanoy* factor—the school's own interest in protecting unpopular student expression—also cuts completely against the District's punishment of M.F.'s speech. In fact, Defendants' actions do the exact opposite of "protecting [M.F.]'s unpopular expression." *Id.* Even if crude and ill-advised, M.F.'s speech is likely protected by the First Amendment. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 223 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend."); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). While Defendants contend that M.F.'s speech is of no value due to its mean-spirited character, the constitutional right to free speech does not depend on a state actor's assessment of what value particular speech

holds.[33] Indeed, the First Amendment's protection includes "the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U.S. 665, 674 (1944).

### 3. Substantial Disruption Caused by Serious or Severe Bullying

Having determined that the three *Mahanoy* features, taken together, likely mean the District has a diminished capacity to regulate M.F.'s off-campus speech, the Court next turns to whether a potential exception applies. Absent a "specific showing of a constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Tinker*, 393 U.S. at 511. The Supreme Court explicitly listed "several types of off-campus behavior that *may* call for school regulation" due to a constitutionally valid reason. *Mahanoy*, 141 S.Ct. at 2045 (emphasis added). One of the behaviors on the list[34] is potentially implicated here: "serious or severe bullying or harassment targeting particular individuals." *Id.* But the Supreme Court left open the possibility that a school may regulate speech that qualifies as "serious or severe bullying or harassment" provided that it caused, or had the potential to cause, substantial disruption to the

---

[33] Defendants describe the shared TikTok account as part of the LaLaBop trend on TikTok. Def.'s Resp. to Pl.'s Br. in Supp. of Emergency Mot. for TRO 10 n.3, ECF No. 8. Indeed, the TikTok account was called "Durham LaLaBop." Aff. of Whitney Wheeler ¶ 2, Def.'s Resp. to Pl.'s Br. in Supp. of Emergency Mot. for TRO, ECF No. 8-1. According to Defendants, those who engage in this online trend post a picture of the allegedly promiscuous tween or teen with accompanying text designed to shame that behavior *Id.* This trend is apparently a reaction to minors who engage in sexual acts with multiple people. *Id.* Neither side briefs whether the LaLaBop trend is political speech. Plaintiff generally suggests that M.F.'s speech has political character by citing to political speech cases but does not specifically discuss LaLaBop. Pl.'s Br. in Supp. of Emergency Mot. for TRO 12–13, ECF No. 5. Although Defendants emphatically reject any comparison of M.F.'s purported LaLaBop speech to political speech, *see id.* at 12, the Court lacks sufficient information about the LaLaBop trend at this stage to conclude that it lacks any socio-political character and is nothing more than a mean-spirited craze.

[34] Defendants also point to another behavior on the Supreme Court's list of behaviors: threats to students. Def.'s Resp. to Pl.'s Br. in Supp. of Emergency Mot. for TRO 5, ECF No. 8; *see also Mahanoy*, 141 S.Ct. at 2045 (including "threats aimed at teachers or other students" on the list of off-campus behavior that may call for school regulation). However, the Court only considers the "serious or severe bullying or harassment" behavior at this stage due to the lack of any evidence showing that threats *from* M.F. were included in his speech. *Cf. Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 387 (5th Cir. 2015) (en banc) (holding that the school reasonably disciplined a student for an off-campus, out-of-school rap song posted online due to directing threats at particular school individuals).

school environment. *Id.* at 2045, 2047–48. Substantial disruption is a "demanding standard." *Id.* at 2047–48.

In an attempt to meet this standard, Defendants supply a detailed account of the Durham community's outcry—from parents and students alike—responding to the off-campus speech made by M.F. and Minor #3. But this uproar appears intertwined with three phenomena that go beyond M.F.'s individual speech: (1) perceptions regarding Minor #3's repeated bullying behavior in the past, (2) subsequent speech made by other students, and (3) preexisting frustrations in the community regarding the District's response to bullying. Wheeler's affidavit highlights this convolution. What these phenomena have in common is that they are unrelated to M.F.'s particular speech.

Beginning with the first phenomenon, the evidence at this stage reveals that most of the outcry is not due to M.F.'s speech but instead due to Minor #3's post (about Minor #2), as well as Minor #3's pattern of past bullying behavior. When Wheeler and her administrative team first learned of M.F.'s post, they determined that no investigation into or punishment for the posts was necessary.[35] In fact, even a full day after first learning about the posts, the District still had no plans to take initiate an investigation. And although these actions later occurred, Defendants supply zero evidence that the impetus for the change in course was due to disruption that resulted *from M.F.'s speech*. Whatever disruption was caused at Durham, it appears primarily linked to the content of Minor #3's speech as well as frustration about Minor #3's past bullying behavior.[36]

As it relates to the second phenomenon, subsequent speech by other students and parents (*i.e.*, sharing screenshots of the posts and engaging in additional speech acts about those posts)

---

[35] Aff. of Whitney Wheeler ¶ 3, Def.'s Resp. to Pl.'s Br. in Supp. of Emergency Mot. for TRO, ECF No. 8-1.

[36] *Id.* ¶¶ 3, 5, 19–28.

also appears to have contributed to the disruption at Durham.[37] But M.F. was not the one reposting and spreading his original speech about Minor #1. In fact, he quickly took the post down. Nor does he appear responsible at all for creating the speech about Minor #2, which seems to be the primary source of disruption.[38] Unfortunately, the pervasiveness of social media in our daily lives "has blurred the lines between off- and on-campus speech, causing increased difficulty for schools and parents alike." *McClelland*, 63 F.4th at 1006. Despite this unfortunate consequence of modern technology, the Supreme Court acknowledged that online speech "might well be transmitted to other students . . . and faculty." *Mahanoy*, 141 S.Ct. at 2047. Even though online speech still carries the risk of broader transmission to the Durham and its community, *Mahanoy* suggests that the potentially broad reach of online speech does not alter the fact that schools still have a diminished interest in regulating off-campus speech. *Id.*; *cf. Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 392 (5th Cir. 2015) (en banc) (acknowledging that certain instances of non-threatening online student communications "accessed anywhere, by anyone, [and] at any time . . . might be protected speech under the First Amendment"). Because subsequent speech made by other students and parents likely contributed to the commotion at Durham, the Court at this stage cannot attribute the disruption to M.F. based only on an attenuated link to his speech.

Finally, regarding the third phenomenon, Plaintiff suggests that the "overbearing pressure of parents in the District and the frequent criticism Wheeler and Ray have received . . . for being soft on bullying most likely caused Defendants to overreact and scapegoat an eleven-year-old child."[39] Conceivably, this broader community frustration regarding how the District has previously handled bullying incidents is the primary cause of the disruption on Durham's campus.

---

[37] *Id.* ¶¶ 5, 16, 20–21, 29.
[38] *Id.* ¶¶ 3, 5, 19–28.
[39] Pl.'s Br. in Supp. of Emergency Mot. for TRO 15, ECF No. 5.

And it seems equally likely that the impetus behind the District's particular punishment of M.F.'s speech was motivated by allaying further criticism about the District's approach to bullying.[40] Indeed, Wheeler's affidavit makes clear that she did not even intend to punish M.F.'s speech until *after* receiving calls from parents.[41]

Nothing in Wheeler's affidavit or otherwise before the Court at this stage shows that M.F. engaged in additional speech that could be viewed as a pattern of bullying that contributed to the community's frustrations in the first place. The record at this stage contains only a single incident of possible bullying behavior. Defendants offer no concrete basis for the conclusion that M.F.'s speech—and not the community's broader frustration regarding the District's handling of bullying—actually caused the disruption to Durham's educational environment. Perhaps most fatal to Defendants is this lack of evidence showing *how* M.F.'s isolated speech is directly responsible for the disruption.[42] Something more than unadorned speculation is required. Therefore, the evidence at this stage falls short of demonstrating that M.F.'s speech caused a substantial, material disruption.

In order to justify punishing M.F.'s speech under the Code of Conduct,[43] Defendants must

---

[40] *Id.* at 15 (citing Pl.'s Orig. & Verified Compl. ¶¶ 35–36, 40, ECF No. 1). It is unclear whether Defendants considered any alternative punishments. And it is also unclear why Defendants specifically chose DAEP rather than another less severe punishment after M.F. had already served a three-day suspension.

[41] Aff. of Def. Wheeler ¶ 3, Defs.' Resp. to Pl.'s Emergency Mot. for TRO, ECF No. 8-1.

[42] Yet another cause may also be partly responsible for the disruption: a uniformed police officer, SRO Wormley, used investigative tactics that pulled large numbers of kids out of class and away from learning. *Id.* ¶¶ 10–12.

[43] In his Complaint, Plaintiff alludes to the District's past community tension over allowing critical race theory into the District. Pl.'s Br. in Supp. of Emergency Mot. for TRO 21, ECF No. 5. The Code of Conduct defines "bullying" (including "cyberbullying") "as a single significant act or pattern or acts by one or more students directed at another student that exploits an *imbalance of power* and involves engaging in written or verbal expression, expression through electronic means, or physical conduct." Def.'s Resp. to Pl.'s Br. in Supp. of Emergency Mot. for TRO 10, ECF No. 5 (emphasis added). Such language rings of critical race theory and its Marxist underpinnings. *See generally e.g.*, Anthony Paul Farley, *When the Stars Begin to Fall: Introduction to Critical Race Theory & Marxism*, 1 COLUM. J. RACE & L. 226 (2012) (discussing the Marxist influence on critical race theory); John O. Calmore, *"Chasing the Wind": Pursuing Social Justice, Overcoming Legal Mis-Education, and Engaging in Professional Re-Socialization*, 37 LOY. L.A. L. REV.,

"show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint"—including M.F.'s detested remarks. *Tinker*, 393 U.S. at 509. At this stage, Defendants have not pointed to "something more" that would allow the Court to find M.F.'s isolated speech as rising to the level of serious or severe bullying or harassment. Indeed, a single instance of an offensive post—despicable as it may be— cannot support the conclusion that the speech is serious or severe bullying. Likewise, it was the presence of multiple other phenomena that conceivably caused disruption at Durham. The District has not sufficiently explained *how* M.F.'s speech caused substantial disruption and also appears to be punishing M.F. in response to these other phenomena. Such regulation exceeds the prudent limitations on school authority over children and improperly traverses into the domain that belongs to parents. And such regulation certainly fails to heed Justice Alito's critical warning that "school officials should proceed cautiously before venturing into this territory." *Mahanoy*, 141 S.Ct. at 2059 (Alito, J., concurring). Without a specific showing that M.F.'s speech *actually* caused substantial disruption as required by *Tinker*, Plaintiff's punishment likely violated his First Amendment rights. *See* 393 U.S. at 514 (requiring evidence of substantial disruption of a school activity *by* the speech in question). Thus, this factor weighs in favor of granting a TRO.

### B. Substantial Threat of Irreparable Harm

In the Fifth Circuit, it is "well-established" that a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*,

---

1167 (2004) (describing critical race theory as part of the social justice effort to "correct imbalances of power and wealth"); Filippa Marullo Anzalone, *It All Begins with You: Improving Law School Learning Through Professional Self-Awareness and Critical Reflection*, 24 HAMLINE L. REV. 324 (2001) (encouraging teachers to "act as an agent of change, liberation, and transformation" because "teaching is a political act and a key concern of critical pedagogy is that educators recognize the innate imbalance of power in our institutions and classrooms") (citation omitted)) While this definition potentially raises important legal issues, none of the pleadings at this stage seek court action regarding this definition.

703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). Where "[t]he loss of First Amendment freedoms" are at stake "for even minimal periods of time," this "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). In other words, irreparable harm is presumed in First Amendment cases given that money damages would likely provide inadequate remediation. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). Despite this presumption, "the assertion of First Amendment rights does not automatically require a finding of irreparable injury." *Id.* (cleaned up).

Plaintiff stresses that sending M.F. to DAEP is the most extreme form of punishment—other than outright expulsion—the District could have chosen from the list of possible punishments.[44] Right now, M.F. is barred from the school of his choosing as punishment for off-campus speech likely protected by the First Amendment. Not only that, M.F. must attend a school that appears populated entirely by students who engaged in conduct of a completely different nature than M.F.'s speech: namely criminal activity. Such conduct includes the illegal use of drugs on campus and bringing weapons to campus.[45] It is difficult to see how attending a different school—and one populated by students whose conduct is so egregious that they must be separated from other children—is not irreparable harm. And making matters worse, Plaintiff argues that M.F. is now susceptible to social stigmatization as a result of his placement in such a school and inability to partake in other school-related activities during his time in DAEP.[46]

Defendants' responsive arguments for this factor are unavailing. First, Defendants do not dispute that Plaintiff's irreparable injury is the loss of First Amendment freedoms.[47] Instead, most

---

[44] Pl.'s Br. in Supp. of Emergency Mot. for TRO 7, ECF No. 5.
[45] *Id.* at 15.
[46] *Id.*; Pl.'s App'x in Supp. of Reply Br. 4, ECF No. 12.
[47] Defs.' Resp. to Pl.'s Emergency Mot. for TRO 14–15, ECF No. 8.

of Defendants arguments on this factor simply rehash the points made regarding the success on the merits factor.[48] Second, Defendants contend that irreparable harm cannot occur until after Plaintiff exhausts his administrative remedies within the District.[49] Not only does this contention lack any legal support in Defendants' brief, but it is at odds the well-established rule that "plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court" unless otherwise statutorily required. *Porter v. Nussle*, 534 U.S. 516, 523 (2002). And for good reason.

The Code of Conduct states that it "may not be used to overturn a disciplinary assignment."[50] Even if it could be used in this way, the appeals process outlined in the Code of Conduct—combined with the specifics of the DAEP placement order—makes M.F.'s DAEP placement functionally unappealable. At its fastest, the appeals process could take approximately twenty or so days to complete.[51] Because M.F.'s DAEP placement will last for up to forty-five school days, his punishment could likely conclude well before a decision from the multi-tiered appeals process is rendered.[52] All the while, M.F.'s placement in DAEP would not be stayed during the appeals process and could even become moot. *See, e.g.*, *Bell*, 799 F.3d at 388 (describing the mootness question that arose due to as a result of the student's concurrent placement in an alternative disciplinary school ending the day after the scheduled hearing on the issue).

If the Court later determines that Plaintiff actually succeeds on the merits of his First Amendment claim, this disciplinary measure and the consequences therefrom cannot be undone. Crucially, because placement in DAEP likely robs M.F. of his constitutional rights—the

---

[48] *Id.*
[49] *Id.*
[50] Pl.'s Reply Br. in Supp. of Emergency Mot. for TRO 8–9, ECF No. 11.
[51] *Id.*
[52] *Id.*; Defs.' Resp. to Pl.'s Emergency Mot. for TRO 14–15, ECF No. 8.

quintessential irreparable harm—no damages would provide an adequate remedy. Without a TRO, Plaintiff is suffering, and will continue to suffer, irreparable harm. Accordingly, the Court concludes that, at this stage, the irreparable harm factor also weighs in favor of granting a TRO.

### C.  Balance of Hardships and the Public Interest

The final factor the Court must consider is the balance of the equities and the public interest, which "merge" when the government is a party. *Nken*, 556 U.S. at 435. A court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). At the same time, a court must weigh any purported injuries the enjoined party may experience against the strong likelihood that they will not succeed on the merits. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021) (explaining that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by the requesting party).

Both parties offer interests that the Court now weighs. On one side, Plaintiff asserts an important constitutional right under the First Amendment.[53] Plaintiff has demonstrated a substantial likelihood of success on the merits of his First Amendment claim, which the Court must heavily consider when balancing the equities. But even more important here is the fact that Plaintiff seeks protection of a *constitutional* right, which is always in the public interest. *See Texas for Free Enter. v. Tex. Ethics Comm'n*, 723 F.3d 535, 539 (5th Cir. 2013) (explaining that "protecting First Amendment freedom [is] always in the public interest" (cleaned up)). Combined with the purported injuries M.F. is already experiencing—and will continue to experience— without a TRO, the equities strongly favor Plaintiff.

On the other side, Defendants once again rehash their merits arguments.[54] But even when

---

[53] Pl.'s Br. in Supp. of Emergency Mot. for TRO 24, ECF No. 5.
[54] Defs.' Resp. to Pl.'s Emergency Mot. for TRO 15–17, ECF No. 8.

Defendants offer independent reasons as to why the equities favor them, they still do not persuasively shift the equities in their direction. For instance, Defendants contend that failing to "act . . . could result in a violation of Texas State Law."[55] There are two fatal problems with this contention. First, the Supremacy Clause of the U.S. Constitution clearly controls. U.S. CONST. art. VI, cl. 2 ("This Constitution . . . shall be the supreme Law of the Land; and Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Indeed, "[e]veryone agrees that state laws must still comply with . . . the First Amendment." *Tenn. Wine & Spirits Retailers Assoc. v. Thomas*, 139 S.Ct. 2449, 2447 (2019) (Gorsuch, J., dissenting). In this situation, Defendants' fear of violating Texas law by respecting federal law is entirely misplaced. Texas law simply cannot be used by a state actor to justify administering a regulation in such a way that would violate fundamental federal rights.

Second, Defendants offer nothing of substance to counter the well-established notion that "protecting First Amendment freedoms [is] *always* in the public interest." *Texas for Free Enter.*, 723 F.3d at 539 (emphasis added). Sidestepping this contention, Defendants instead give their perspective as to what the appropriate policy should be in this case, stating that "citizens are disserved when federal judges substitute their notions of fairness in place of officials put in place to make these kinds of policy decisions and judgment calls."[56] Be that as it may, it is not the Court's own notions of fairness that compel entry of a TRO here. For better or for worse, this result is compelled by *the law*.

Therefore, the Court finds that Defendants do not come close to "present[ing]" the "powerful evidence of harm to its interests" necessary overcome Plaintiff's showing on this factor. *Opulent Life Church*, 697 F.3d at 297. It seems that Defendants will suffer little, if any, harm from

---

[55] *Id.* at 16.
[56] *Id.* (citing *Khan v. Fort Bend Indep. Sch. Dist.*, 561 F.Supp. 2d 760, 767 (S.D. Tex. 2008)).

temporarily reinstating M.F. at Durham. In contrast, Plaintiff demonstrated that he will very likely suffer harm should his punishment continue at this time. Combined with the fact that Defendants have already failed to explain how suppressing M.F.'s off-campus speech did not offend the First Amendment, Plaintiff's potential injuries and likely success on the merits jointly outweigh any harm Defendants purported they may experience. *See Mack*, 4 F.4th at 316.

## IV.    SCOPE OF RELIEF

Having determined that Plaintiff carried his burden showing that a temporary equitable remedy is warranted in this situation, the Court must next decide how to provide complete relief. When granting an injunction, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). In keeping with that obligation, the Court will tailor the scope of this TRO with careful attention to avoid upsetting the balance of the competing interests. Thus, the Court temporarily **ENJOINS** Defendants from continuing to punish M.F. for his protected off-campus, out-of-school speech. Further, the Court temporarily **DIRECTS** Defendants to immediately reinstate M.F. at Durham Intermediate School. This relief should alleviate Plaintiff's demonstrable injuries without unnecessarily burdening Defendants. Crucially, this temporary relief only remains in effect for fourteen days—until 11:59 p.m. on November 18, 2023. After a hearing on the merits, the Court will decide whether this relief should continue beyond the fourteen-day period. FED. R. CIV. P. 65(b)(2)–(3).

## V.    CONCLUSION

There is little doubt that the posts at issue in this lawsuit contain vile content. And it is understandable that the Durham community is upset. But the evidence at this stage does not show that this particular instance of off-campus speech—as revolting as it may be—falls into the narrow

22

category of off-campus speech that a school can regulate. Instead, any punishment for this disgraceful, off-campus speech belongs to the parents—not to the school. It is for these reasons that the Court **GRANTS** Plaintiff's request for a TRO. Accordingly, the Court temporarily **ENJOINS** Defendants—along with their officers, agents, servants, and employees—from continuing to punish M.F. for his protected off-campus, out-of-school speech. Further, the Court temporarily **DIRECTS** Defendants—along with their officers, agents, servants, and employees— to immediately reinstate M.F. at Durham Intermediate School. Finally, the Court waives the security requirement of Federal Rule of Civil Procedure 65(c).[57] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding that the district court has discretion to waive the security requirement).

Importantly, the Court stresses to the parties to this lawsuit, as well as all members of the Durham community, that this TRO is a preliminary determination designed to maintain the status quo until such time that a full examination on the merits is possible. To that end, the Court sets this matter for hearing on **November 16, 2023 at 9:00 a.m**. At such time, the Court will determinate whether or not this TRO should continue during the life of this lawsuit.

SO ORDERED on this **4th day** of **November, 2023**.

Reed O'Connor
UNITED STATES DISTRICT JUDGE

---

[57] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).