IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| M.F., a minor, by and through his father, MICHAEL FISHER, and his mother, KATHERINE FISHER, | § § § § | |
| Plaintiff, | § § | Civil Action No. 4:23-cv-01102-O |
| v. | § § § | |
| CARROLL INDEPENDENT SCHOOL DISTRICT, WHITNEY WHEELER, in her individual capacity and capacity as Principal of Durham Intermediate School, AND KIM RAY, in her individual capacity and capacity as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School, | § § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

This case is about protecting a child. The days of corporal punishment were supposedly over; now instead of switches, schools have switched to stigma.

The case arises out of Carroll Independent School District's discipline of a sixth grader—who has an impeccable academic and disciplinary record—for benign, off-campus, out-of-school speech. M.F. published two posts on TikTok—one about *himself*—and then took them down soon after. On a scale of things other kids have done that have led to actual injury to others, M.F.'s actions register, at worst, as no more than normal, verbal barb-throwing standard to every adolescent boy's childhood. The District suspended him for three days, during which time he failed every assignment while a sham investigation took place. And what an investigation it was: the District had a uniformed officer from the Southlake Police Department pull M.F. out of class three

times in one day as though M.F. were a common criminal. Without informing M.F. of his rights or informing his parents, the officer interrogated M.F. outside the presence of his parents or counsel.

And then the officials of the District's school in question, Whitney Wheeler and Kim Ray, conducted a kangaroo proceeding on Friday, October 27, 2023, in which they accused M.F. of making posts they had no evidence he had made, after which they convicted and sentenced him to forty-five days in an alternative school where, among other things, he will: not receive the same education, be severed from his social relationships, and surely fall behind and suffer social stigma.

He is *twelve*.[1]

To be clear, the punishment is not remedial. It is purely punitive, and it is wrong.

The District's student code of conduct broadly gives the District the authority to discipline students "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, <u>regardless of time or location</u>." But any such policy still requires the District, or anyone acting on its behalf, to give notice to M.F.'s parents. Moreover, the First Amendment is sacred in this nation, and even more so in Texas. And the District's policy and actions vastly exceed the limits of its *in loco parentis* authority, all in subversion of the First Amendment.

What's more, the District has not established with any evidence that M.F.'s speech might disrupt the orderly operation of the school, let alone materially so. The District meted out the most severe punishment short of expulsion. Given the suspension already served by M.F. and the humiliation he will suffer for forty-five more days if the District's unconstitutional punishment is permitted, it is a wonder how any reasonable person would not question why the punishment is so disproportionate to the supposed offense. M.F. has been punished enough, and this Court should

---

[1] Between filing his original complaint and this complaint, M.F. turned twelve. At the time of the events in question, M.F. was eleven years old.

step in to stop rogue bureaucrats dead-set on parenting other people's children.

For these reasons, M.F. and his parents seek immediate injunctive relief and damages.

## I.     JURISDICTION AND VENUE

1.     This action seeks to vindicate rights protected by the First and Fourteenth Amendments to the United States Constitution and is brought under 42 U.S.C. § 1983. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

2.     Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(1) because Carroll Independent School District is the only defendant and resides in the Northern District of Texas.

3.     Venue is also proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

4.     Venue is proper in the Fort Worth Division of the Northern District of Texas under 28 U.S.C. § 124(a)(2) because Carroll Independent School District resides in Tarrant County or, in the alternative, Tarrant County is the location in which a substantial part of the events or omissions giving rise to the claims occurred.

## II.     PARTIES

5.     Plaintiff M.F. ("M.F." or "Plaintiff") is a twelve-year-old child who attends school in the Carroll Independent School District. He lives with his parents in Southlake, Texas.

6.     Plaintiff Michael Fisher ("Mr. Fisher") is M.F.'s father. Mr. Fisher brings this action on behalf of his minor son, M.F.

7.     Plaintiff Katherine Fisher ("Mrs. Fisher") (collectively with M.F. and Mr. Fisher, the "Fishers") is M.F.'s mother. Mrs. Fisher brings this action on behalf of her minor son, M.F.

8. Defendant Carroll Independent School District (the "District") is a political subdivision of the state of Texas with principal offices at 2400 North Carroll Avenue, Southlake, Texas 76092. The District may be served pursuant to Texas Civil Practice and Remedies Code § 17.024(c) by serving the president of the District's school board, Cameron Bryan, or the District's superintendent, Lane Ledbetter, at 2400 North Carroll Avenue, Southlake, Texas 76092.

9. Defendant Whitney Wheeler ("Wheeler") is an individual who served as Principal of Durham Intermediate School during the events or omissions giving rise to the claims pleaded herein. Wheeler is being sued both in her individual capacity and her official capacity as Principal of Durham Intermediate School. Wheeler may be served wherever she may be found.

10. Defendant Kim Ray ("Ray") is an individual who served as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School during the events or omissions giving rise to the claims pleaded herein. Ray is being sued both in her individual capacity and her official capacity as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School. Ray may be served wherever she may be found.

### III.   FACTUAL BACKGROUND

11. M.F. is a student at Durham Intermediate School ("Durham"), a campus for fifth and sixth graders in the District.

12. M.F. is an exemplary student—he is a high-achieving pupil with excellent grades and test scores. He has also received multiple awards for academic excellence. Further, his disciplinary history in the District is unblemished, with only minor infractions in the same offense category as being tardy to class.

13. On or about three months ago, M.F. was involved in creating an account on the social media platform TikTok.

14. Over the past four weeks, M.F. has been caught in a cycle of mean-spirited exchanges between himself and another individual in his extended friend group ("Minor #1"). Minor #1 had many times made adolescent, hurtful comments to M.F.

15. On Friday, October 20, 2023, M.F. and a friend of his ("Minor #2") were hanging out at Minor #2's house, outside of school hours. At or around 6:00 p.m. that evening, several posts were made on the TikTok account that M.F. and Minor #2 were involved in creating.

16. At least four posts were made on the TikTok account around that time. M.F. created and published only two of the posts—they were the only posts M.F. had created and posted on the TikTok account since the account was created.

17. One of the posts M.F. created and published was a picture of himself with text overlaying the image. The text spoke of M.F. in the third person and consisted of crude, self-denigrating comments.

18. The other post M.F. created and published was a picture of Minor #1, the student who had been consistently teasing M.F. over the past few weeks. Text overlayed the image of Minor #1 and referred to Minor #1 in an uncouth manner, stating, among other things, that Minor #1 was "so ugly," "super dumb," and that "nobody likes him."

19. While several of those involved in the creation of the TikTok account have access to login information for the account, the two posts M.F. created and posted were published from M.F.'s cell phone.

20. At or around 8:30 p.m. that same evening, after receiving negative feedback regarding the posts from his friends, M.F. took down the posts.

21. The following Monday, M.F. learned at school that one of his classmates had been pulled out from class and questioned by Durham officials regarding the TikTok account.

22. Sure enough, the District had commenced investigating the TikTok account the morning of Monday, October 23, after Wheeler received "a couple of emails with attachments of social media posts made over the weekend that could potentially be interpreted as bullying/cyberbullying and/or harassment of [Durham] students."

23. On Tuesday, October 24, during third period, M.F. was pulled out of class by a uniformed officer of the Southlake Police Department (the "Officer") and escorted M.F. to his office at the school. There, the Officer interrogated M.F. regarding the TikTok account.

24. The Officer and M.F. were the only individuals in the room. The door was shut to the outside. M.F. was not informed of any of his rights by the Officer at any time. M.F.'s parents did not consent or even receive a call that their son was being interrogated by a police officer.

25. Understandably scared, M.F., all of eleven years old, told the Officer he did not make the posts that had been posted to the shared TikTok account that past Friday.

26. While alone with M.F., the Officer confiscated M.F.'s cell phone and demanded that M.F. unlock the cell phone. Once in M.F.'s cell phone, the Officer vigorously probed its contents, at one point ordering M.F. to access the names of people in a specific chat string.

27. At no point was M.F. apprised of his rights when the Officer ordered M.F. to take certain invasive actions as to the cell phone, not to mention that the cell phone is not owned by M.F.—it is owned by Mr. Fisher.

28. After this interrogation, the Officer asked M.F. to return to class.

29. Roughly an hour later, at the beginning of fifth period, the Officer pulled M.F. out of class again and took M.F. to his office. This time, with the door open, the Officer demanded to know whether M.F. created the posts on the TikTok account from the previous Friday. Understandably scared, M.F. denied involvement. During this interaction, the Officer told M.F.

that he and Minor #2 were the only "suspects." The Officer released M.F. at that point to return to class.

30. Approximately half an hour later, while still in fifth period, the Officer pulled M.F. from class again and took M.F. to his office. This time, Minor #2 was already in the office.

31. The Officer began interrogating M.F. yet again, demanding to know of his involvement in the Friday posting on the TikTok account. Understandably scared, M.F. denied involvement.

32. This time, however, Minor #2 told M.F. that Minor #2 had told the Officer that M.F. and Minor #2 were responsible for the posts. Minor #2 also told M.F. that he had informed the District of their involvement because he had been promised a lesser disciplinary action if he admitted to the posts.

33. At that time, M.F. told the Officer that he was involved in the posts from that previous Friday on the TikTok account.

34. Soon after, the Officer and Ray separated M.F. and Minor #2 into separate rooms. M.F. was taken to Ray's office.

35. In Ray's office, Ray instructed M.F. to write and swear to a statement about his involvement in the posts from that previous Friday on the TikTok account. M.F. did so, but he did not mention the several instances of mean-spirited exchanges with Minor #1 in his statement.

36. At that point, Wheeler came into Ray's office and orally reprimanded M.F. Wheeler, the principal of Durham and the individual supposed to be the adult in the room, castigated an eleven-year-old boy as though he were a criminal, ultimately scolding him by telling M.F. that his "heart" is "sneaky."

37. Once the District, by and through its employees and agents, had interrogated and intimidated an eleven-year-old student into a "confession" without informing him of his rights, detaining him, and without parental consent, the District decided it was finally time for M.F.'s parents to be involved. This was the first instance that M.F.'s parents ever learned of M.F.'s potential involvement in the posts, the investigation, or the interrogations of their son.

38. Roughly an hour after the District forced a "confession" out of M.F. by pitting two adolescent boys against one another in a prisoner's-dilemma situation, Wheeler, who had just finished berating M.F., called Mrs. Fisher. But ultimately it was Ray who finally connected with Mrs. Fisher around 2:30 p.m. that day, at which time Ray informed Mrs. Fisher that M.F. had been involved in some posts made on the TikTok account and that M.F. was to serve out-of-school suspension until the District could conduct an investigation (not that the District already had).

39. When Mrs. Fisher arrived at Durham to pick up M.F., Ray informed Mrs. Fisher that the District was contemplating whether to place M.F. in the District's Disciplinary Alternative Education Program ("DAEP") for M.F.'s supposed violation of the District's Student Handbook and Code of Conduct (the "Code of Conduct"). Mrs. Fisher asked for how long Ray believed the District was considering placing M.F. in DAEP, and Ray told her one to six *weeks*.

40. The next day, the Officer called Mrs. Fisher to ask if she had any questions about the situation. During their conversation, the Officer told Mrs. Fisher that in "most cases" in "most districts," serving a three-day suspension would be sufficient, but that it was "different" in the District because "the parents are more involved."

41. On Thursday, October 26, Mr. and Mrs. Fisher received correspondence from the District via Ray, stating that she would be conducting an investigation into the purported

wrongdoings of M.F. and that a meeting would be held the next day at the school for M.F. to tell his side of the story.

42.     Later that day, less than twenty-four hours before that meeting, Ray communicated that if Mr. and Mrs. Fisher wanted to bring counsel to the meeting on M.F.'s behalf, they would need to provide twenty-four-hour notice to the District—obviously an impossible condition.

43.     That next day, Friday, October 27, M.F., Mr. Fisher, Mrs. Fisher, M.F.'s grandfather, and counsel went to Durham for the meeting called by the District. Attending the meeting for the District were Wheeler, Ray, the Officer, and counsel for the District.

44.     Once there, Ray began reading from a script and stated that the meeting served as the administrative hearing into the matter at issue. In stating the "allegations" against M.F., Ray simply recited the provision from the Code of Conduct M.F. purportedly violated. When M.F.'s counsel asked Ray to state the factual allegations underlying M.F.'s purported infraction, Ray stated that she already had and proceeded to read once again from the Code of Conduct.

45.     When pressed by M.F.'s counsel yet again, Wheeler spoke up, stating that M.F. had posted inappropriate material on the TikTok account. M.F.'s counsel asked Wheeler to show what posts, if any, the District possessed and which of those posts M.F. created and published.

46.     Wheeler first showed the post showing Minor #1, for which M.F. took responsibility there and then. Wheeler then showed a second post and attributed it to M.F.—but when M.F. was asked by his counsel, he confirmed that he neither created nor published that post. The District had incorrectly attributed someone else's speech to M.F.

47.     Next, M.F. was given the opportunity to tell his side of the story. Unlike during the District's interrogations, M.F. had spoken to his parents, had his parents present, and had counsel with him. As such, he was no longer scared of and confused by the situation, and he provided an

accurate rendition of the events. He took responsibility for the posts he created and published, and expressed sincere remorse and regret for doing so.

48. Before the meeting broke for further deliberations by the District, M.F.'s counsel directed Wheeler and Ray to various pages in the Code of Conduct listing the vast array of disciplinary actions the District permits as to its students—wherein placement in DAEP is listed as the second-most severe punishment aside from expulsion. M.F.'s counsel asked Wheeler and Ray if they considered any of the other disciplinary actions for M.F. before DAEP, since M.F. is an excellent academic performer with no serious disciplinary infractions on his record.

49. Wheeler and Ray had no answer to the question.

50. At the end of the meeting, Ray informed the attendees that the District would deliberate given M.F.'s statement that day and promptly inform the Fishers of the District's disciplinary decision.

51. Despite everything that occurred at that meeting and the ample time for the District to reconsider its decision, nothing changed. On Sunday, October 29, the District informed M.F. and his parents that the original recommendation would stand—M.F. was to report to DAEP for a sentence of forty-five school days beginning on Monday, October 30. Evidently, evidence had little—if anything—to do with the District's decision.

52. Out of options to meaningfully address the egregious overexertion of authority the District had engaged in, M.F. and his parents turn to this Court to right what the off-the-rails officials of the District have wrought upon an eleven-year-old child.

## IV.   CAUSES OF ACTION

### COUNT ONE
**The District's Punishment of M.F. Violates the First Amendment
to the U.S. Constitution and 42 U.S.C. § 1983**

53. Plaintiff incorporates by reference its factual averments as if fully set forth herein.

54. M.F. engaged in protected speech while off campus and outside of school.

55. When the District learned of this protected speech, the District, through its employees and agents, conducted an "investigation" into the off-campus, out-of-school speech.

56. After "investigating" the off-campus, out-of-school speech, which involved detaining and interrogating M.F. without explaining his rights to M.F. and without informing or receiving consent from M.F.'s parents, the District determined that M.F. was the speaker. From then, the District issued M.F. out-of-school suspension until the District could conduct its disciplinary hearing.

57. At the disciplinary hearing, the District, through its employees and agents, preliminarily informed M.F. that the District intended to place M.F. in DAEP for the rest of the semester—forty-five school days—as punishment for his off-campus, out-of-school speech.

58. Following the disciplinary hearing, and in the face of new evidence, the District did not alter its intended punishment for M.F.

59. In imposing the punishment on M.F. for his off-campus, out-of-school speech, the District, through its employees and agents, acted under color of state law.

60. The District's punishment of placing M.F. in DAEP for his off-campus, out-of-school speech violates the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment.

## COUNT TWO
**The District's Student Code of Conduct, On Its Face, Violates the First Amendment to the U.S. Constitution – 42 U.S.C. § 1983**

61. Plaintiff incorporates by reference its factual averments as if fully set forth herein.

62. The Code of Conduct states that the District has jurisdiction to discipline students, *inter alia*, "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location."

63. On its face, this policy extends the District's authority over students such as M.F. considerably past what federal law and the United States Constitution permit.

64. Public schools do possess "a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). But this is no carte blanche.

65. In particular, off-campus speech "will normally fall within the zone of parental, rather than school-related, responsibility," and "courts must be more skeptical of a school's efforts to regulate off-campus speech." *Id.* at 2046.

66. The Code of Conduct's purported authority to discipline students "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location" is vastly overbroad, sweeping within it considerable amounts of speech and conduct protected by the First Amendment to the United States Constitution.

67. The Code of Conduct's purported authority to discipline students "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location" also constitutes content-based discrimination under the First Amendment to the United States Constitution, as the District can enforce—and has enforced—the Code of Conduct as to students' speech based solely on content (specifically, content the District does not subjectively approve of).

68. Because the Code of Conduct is overbroad and breeds content-based restrictions on constitutionally protected speech, the Code of Conduct violates the United States Constitution.

## COUNT THREE
### The District's Student Code of Conduct, On Its Face, Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution – 42 U.S.C. § 1983

69. Plaintiff incorporates by reference its factual averments as if fully set forth herein.

70. The Code of Conduct states that the District has jurisdiction to discipline students, *inter alia*, "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location."

71. On its face, this policy extends the District's authority over students such as M.F. to just about any speech or conduct in which students may engage.

72. The Code of Conduct's pervading reach into the realm of protected speech is constitutionally problematic—it is impossible to tell from the text of the Code of Conduct what speech falls within the District's self-given disciplinary authority. As a result, the Code of Conduct is constitutionally void for vagueness.

73. A government policy implicating the First Amendment is void for vagueness when it is "unclear whether it regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008). The void-for-vagueness doctrine requires state authorities to "articulate a proscription 'with sufficient definiteness that ordinary people can understand what conduct is prohibited' while providing enough objective metrics that it 'does not encourage arbitrary and discriminatory enforcement.'" *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 580 (5th Cir. 2012) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 132 (2007)).

74. No ordinary person looking at the Code of Conduct can understand what conduct is prohibited. For instance, in this case, M.F. did not and could not have had notice that his

protected speech, though crude, would subject him to discipline from anyone other than his parents, but especially not the public school he attends.

75. Furthermore, the Code of Conduct provides almost zero objective metrics by which its standards will govern students. As is evident in M.F.'s case, this encouraged the District to enforce the Code of Conduct against M.F. in an arbitrary and discriminatory manner.

76. Thus, the Code of Conduct is void for vagueness and thereby constitutionally infirm.

## PRAYER FOR RELIEF

77. Plaintiff M.F., a minor, by and through his father, Michael Fisher, and his mother, Katherine Fisher, prays this Court:

A. Declares, under 28 U.S.C. §§ 2201–02, that the District's disciplinary action against M.F. for his off-campus, out-of-school speech violated M.F.'s rights under the First and Fourteenth Amendments to the United States Constitution;

B. Declares, under 28 U.S.C. §§ 2201–02, that the District's Student Code of Conduct, on its face, violates the First and Fourteenth Amendments to the United States Constitution because it is overbroad and produces content-based discrimination;

C. Declares, under 28 U.S.C. §§ 2201–02, that the District's Student Code of Conduct has been used, and may be used, to punish off-campus, out-of-school speech is unconstitutionally vague, and thereby violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

D. Awards Plaintiff damages in an amount to be determined at trial;

E. Awards Plaintiff costs and reasonable attorney's fees under 42 U.S.C. § 1988(b); and

   F. Grants such other legal and equitable relief as may be available that the Court deems proper.

Dated: November 15, 2023         Respectfully submitted,

                */s/ Griffin S. Rubin*
                **Mazin A. Sbaiti**
                Texas Bar No. 24058096
                mas@sbaitilaw.com
                **Jonathan Bridges**
                Texas Bar No. 24028835
                jeb@sbaitilaw.com
                **Griffin S. Rubin**
                Texas Bar No. 24121809
                gsr@sbaitilaw.com
                **SBAITI & COMPANY PLLC**
                Dallas Arts Tower
                2200 Ross Ave., Suite 4900W
                Dallas, Texas 75201
                T: (214) 432-2899
                F: (214) 853-4367

                **ATTORNEYS FOR PLAINTIFF**