**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **M.F., a minor, by and through his father,** | § | |
| **MICHAEL FISHER, and his mother,** | § | |
| **KATHERINE FISHER, MICHAEL** | § | |
| **FISHER, individually, AND** | § | |
| **KATHERINE FISHER, individually,** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 4:23-cv-01102-O** |
| | § | |
| **v.** | § | |
| | § | |
| **CARROLL INDEPENDENT** | § | **JURY TRIAL DEMANDED** |
| **SCHOOL DISTRICT, WHITNEY** | § | |
| **WHEELER, in her capacity as** | § | |
| **Principal of Durham Intermediate** | § | |
| **School, KIM RAY, in her capacity** | § | |
| **as Assistant Principal and Campus** | § | |
| **Behavior Coordinator of Durham** | § | |
| **Intermediate School, CITY OF** | § | |
| **SOUTHLAKE, AND ADRIAN** | § | |
| **WORMLEY, in his official capacity** | § | |
| **as an officer of the Southlake Police** | § | |
| **Department,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

On the night of Friday, October 20, Plaintiff and a friend decided to make some posts on a Tik Tok account created by Plaintiff. Two of the posts were self-deprecating and pictured themselves. One post published by Plaintiff was one more round in a long-standing series of barbs directed back and forth between a fellow student and himself. Another post was published by Plaintiff's friend, using Plaintiff's cell phone and was directed at another fellow student. When Plaintiff received some negative feedback about the posts through group texts that same Friday night, he deleted them quickly. All this happened off-campus, long after school hours on Friday,

and long before school would resume the following Monday.

The following Monday, a few students engaged in mild speculation about who might have made these posts. However, no disruption to the school environment occurred until the school administration itself began pulling students out of classes and leveling irresponsible accusations at Plaintiff and his friend. In fact, a uniformed police officer interrogated Plaintiff without his parents present or even aware of the situation, frightening Plaintiff badly. Understandably, Plaintiff— eleven years old at the time and now twelve—could not bring himself to admit to having created the posts when confronted in such terrifying fashion. He was not told and could not have known at the time that, although the school district had initially adopted a mild approach to the posts, they decided to whip matters into a punitive frenzy when confronted by the parents of the student about whom Plaintiff's friend rather than Plaintiff himself had made a post. The officer interrogated Plaintiff behind closed doors without advising Plaintiff of any of his rights. Later, in repeated interrogations, the officer began playing Plaintiff and his friend off against one another, using aggressive techniques for the purpose of eliciting confessions.

On the basis of these interrogations, in a farcical proceeding on October 27, 2023, the school district administrators on the basis of the flimsiest of evidence imposed on Plaintiff an incredible forty-five day placement at a Disciplinary Alternative Education Program ("DAEP") where he would not receive the same education, would be severed from his social relationships, would fall behind, and would suffer tremendous social stigma, to say nothing of the psychological consequences stemming from a punishment so disproportionate to the level of the alleged offense. This placement came on top of an already-invasive three day suspension previously imposed. The school district administrators and the police officer responsible for Plaintiff's interrogation thus caused him serious injury.

However, the responsibility lies deeper than merely with administrators and police officers. The language of the school district's Code of Conduct actually encourages irresponsible actions and omissions on the part of the school's administrators by giving them broad authority to impose discipline "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location," but without providing sufficient guidance to administrators for them to recognize what might rise to the level of such misconduct. In fact, school district administrators should have been able to ascertain that Plaintiff's conduct on the night of Friday, October 20, 2023, was not substantially likely to create a material disruption in part because it did not in fact create such a disruption on Monday, October 23, 2023. It was the school district itself that created the disruption—primarily an illegitimate disruption of the lives of Plaintiff and his friend—through its reckless brass-knuckles approach to a pair of eleven-year-olds who, having made a mistake, retracted it as quickly as possible. Because the school district's disruption has done substantial injury to Plaintiff, along with the substantial injury done by Officer Wormley and the Southlake Police Department, Plaintiff seeks damages and other remedies through judicial intervention.

## I.    <u>JURISDICTION AND VENUE</u>

1.      This action seeks to vindicate rights, privileges, or immunities secured by the Constitution or laws and is brought under 42 U.S.C. § 1983. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

2.      Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(1) because Carroll Independent School District is the only defendant and resides in the Northern District of Texas.

3.     Venue is also proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

4.     Venue is proper in the Fort Worth Division of the Northern District of Texas under 28 U.S.C. § 124(a)(2) because Carroll Independent School District resides in Tarrant County or, in the alternative, Tarrant County is the location in which a substantial part of the events or omissions giving rise to the claims occurred.

## II.     PARTIES

5.     Plaintiff M.F. ("M.F." or "Plaintiff") is a twelve-year-old child who attends school in the Carroll Independent School District. He lives with his parents in Southlake, Texas.

6.     Plaintiff Michael Fisher ("Mr. Fisher") is M.F.'s father. Mr. Fisher brings this action in his individual capacity and on behalf of his minor son, M.F. He lives in Southlake, Texas.

7.     Plaintiff Katherine Fisher ("Mrs. Fisher") (collectively with M.F. and Mr. Fisher, the "Fishers") is M.F.'s mother. Mrs. Fisher brings this action in her individual capacity and on behalf of her minor son, M.F. She lives in Southlake, Texas.

8.     Defendant Carroll Independent School District (the "District") is a political subdivision of the state of Texas with principal offices at 2400 North Carroll Avenue, Southlake, Texas 76092. The District may be served pursuant to Texas Civil Practice and Remedies Code § 17.024(c) by serving the president of the District's school board, Cameron Bryan, or the District's superintendent, Lane Ledbetter, at 2400 North Carroll Avenue, Southlake, Texas 76092.

9.     Defendant Whitney Wheeler ("Wheeler") is an individual who served as Principal of Durham Intermediate School during the events or omissions giving rise to the claims pleaded

herein. Wheeler is being sued in her official capacity as Principal of Durham Intermediate School. Wheeler may be served wherever she may be found.

10.     Defendant Kim Ray ("Ray") is an individual who served as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School during the events or omissions giving rise to the claims pleaded herein. Ray is being sued in her official capacity as Assistant Principal and Campus Behavior Coordinator of Durham Intermediate School. Ray may be served wherever she may be found.

11.     Defendant City of Southlake ("Southlake") is an incorporated city located in Tarrant County and Denton County, Texas. Because Southlake's city charter does not establish the Southlake Police Department as a separate jural entity, Southlake is the proper party to sue in an action against the Southlake Police Department. Southlake may be served pursuant to Texas Civil Practice and Remedies Code § 17.024(b) by serving the mayor of Southlake, John Huffman, at 1400 Main Street, Southlake, Texas 76092.

12.     Defendant Adrian Wormley ("Wormley") is an individual who served as a student resource officer at Durham Intermediate School during the events or omissions giving rise to the claims pleaded herein. Wormley is a uniformed police officer in the Southlake Police Department. Wormley is being sued in his individual capacity and in his official capacity as a police officer of the Southlake Police Department. Wormley may be served wherever he may be found.

### III.    FACTUAL BACKGROUND

13.     M.F. is a student at Durham Intermediate School ("Durham"), a campus for fifth and sixth graders in the District.

14.     M.F. is an exemplary student—he is a high-achieving pupil with excellent grades and test scores. He has also received multiple awards for academic excellence. Further, his

disciplinary history in the District is unblemished, with only minor infractions in the same offense category as being tardy to class.

15.     On or about three months ago, M.F. was involved in creating an account on the social media platform TikTok.

16.     Since September 2023, M.F. has been caught in a cycle of mean-spirited exchanges between himself and another individual in his extended friend group ("Minor #1"). Minor #1 had many times made adolescent, hurtful comments to M.F.

17.     On Friday, October 20, 2023, M.F. and a friend of his ("Minor #2") were hanging out at Minor #2's house, outside of school hours. At or around 6:00 p.m. that evening, several posts were made on the TikTok account that M.F. and Minor #2 were involved in creating.

18.     At least four posts were made on the TikTok account around that time. M.F. created and published only two of the posts—they were the only posts M.F. created and posted on the TikTok account since the account itself was created.

19.     One of the posts M.F. created and published was a picture of himself with text overlaying the image. The text spoke of M.F. in the third person and consisted of crude, self-denigrating comments.

20.     The other post M.F. created and published was a picture of Minor #1, the student who had been consistently bullying M.F. Text overlayed the image of Minor #1 and referred to Minor #1 in an uncouth manner, stating, among other things, that Minor #1 was "so ugly," "super dumb," and that "nobody likes him."

21.     The two posts M.F. created and posted were published from M.F.'s cell phone.

22.     At or around 8:30 p.m. that same evening, after receiving negative feedback regarding the posts from his friends, M.F. took down the posts.

23.     The following Monday, when Wheeler, Ray, and Durham's counselor had their weekly meeting, Durham's counselor shared that she received an email from the mother of Minor #1, which contained the post M.F. had created and posted about Minor #1. At that time, Wheeler and Ray agreed that the only action that Durham need take was for the counselor to reach out to the mother of Minor #1 to see if Minor #1 needed additional support. In deciding that no disciplinary action was necessary, Wheeler and Ray considered that the post of Minor #1 was made outside of school hours and was likely made on a personal device.

24.     But once they learned that adults online (a few being parents of Durham students, but most unaffiliated with Durham) were upset by the post of Minor #2—which M.F. neither created nor published)—Wheeler and Ray decided action was necessary.

25.     That same day, M.F. learned that one of his classmates had been pulled out from class and questioned regarding the TikTok account—this was the investigation Wheeler and Ray commenced after the social media outcry by adults primarily unaffiliated with Durham.

26.     On Tuesday, October 24, during third period, M.F. was pulled out of class by Wormley. Wormley marched M.F. to his office and interrogated M.F. regarding the TikTok account.  On information and belief, Wormley employed policies and practices of the City of Southlake as promulgated by its Chief of Police that are designed for adult suspects but that do not properly distinguish between adults and young schoolchildren upon whom the effects and impacts of the employment of such policies and practices would be disastrous and long-lasting.

27.     Wormley and M.F. were the only individuals in the room. The door was shut to the outside. M.F. was not informed of any of his rights by Wormley at any time. M.F.'s parents did not consent or even receive a call that their son was being interrogated by a uniformed police officer.

28.     Understandably scared, M.F., all of eleven years old, told Wormley he did not make the posts that had been published to the TikTok account that past Friday.

29.     While alone with M.F., Wormley confiscated M.F.'s cell phone and demanded that M.F. unlock the cell phone. Once in M.F.'s cell phone, the Officer vigorously probed its contents, at one point ordering M.F. to access the names of people in a specific chat string.

30.     At no point was M.F. apprised of his rights when the Officer ordered M.F. to take these invasive actions as to the cell phone, not to mention that the cell phone is not owned by M.F.—it is owned by Mr. Fisher.

31.     After this interrogation, Wormley returned M.F.

32.     Roughly an hour later, at the beginning of fifth period, Wormley pulled M.F. out of class again and took M.F. to his office. This time, with the door open, Wormley demanded to know whether M.F. created the posts on the TikTok account from the previous Friday. Understandably scared, M.F. denied involvement. During this interaction, Wormley told M.F. that he and Minor #2 were the only "suspects." Wormley released M.F. at that point to return to class.

33.     Approximately half an hour later, while still in fifth period, Wormley pulled M.F. from class again and took M.F. to his office. This time, Minor #2 was already in the office.

34.     Wormley began interrogating M.F. yet again, demanding to know of his involvement in the Friday posting on the TikTok account. Understandably scared, M.F. denied involvement.

35.     This time, however, Minor #2 told M.F. that Minor #2 had told Wormley that M.F. and Minor #2 were responsible for the posts. Minor #2 also told M.F. that he had informed the District of their involvement because he had been promised a lesser disciplinary action if he admitted to the posts.

36.     At that time, M.F. told Wormley that he was involved in the posts from that previous Friday on the TikTok account.

37.     Soon after, Wormley and Ray separated M.F. and Minor #2 into separate rooms. M.F. was taken to Ray's office.

38.     In Ray's office, Ray instructed M.F. to write and swear to a statement about his involvement in the posts from that previous Friday on the TikTok account. M.F. did so, but he did not mention the several instances of mean-spirited exchanges with Minor #1 in his statement.

39.     At that point, Wheeler came into Ray's office and orally reprimanded M.F. Wheeler, the principal of Durham and the individual supposed to be the adult in the room, castigated an eleven-year-old boy as though he were a criminal, ultimately scolding him by telling M.F. that his "heart" was "sneaky."

40.     Once the District and Wormley, by and through its employees and agents, had interrogated and intimidated an eleven-year-old student into a "confession" without informing him of his rights, detaining him, placing him in custody, and without parental consent, the District decided it was finally time for M.F.'s parents to be involved. This was the first instance that M.F.'s parents ever learned of M.F.'s potential involvement in the posts, the investigation, or the interrogations of their son.

41.     Roughly an hour after the District forced a "confession" out of M.F. by pitting two adolescent boys against one another in a prisoner's-dilemma situation, Wheeler, who had just finished berating M.F., called Mrs. Fisher. But ultimately it was Ray who finally connected with Mrs. Fisher around 2:30 p.m. that day, at which time Ray informed Mrs. Fisher that M.F. had been involved in some posts made on the TikTok account and that M.F. was to serve out-of-school suspension until the District could conduct an investigation (not that the District already had).

42.     When Mrs. Fisher arrived at Durham to pick up M.F., Ray informed Mrs. Fisher that the District was contemplating whether to place M.F. in the District's Disciplinary Alternative Education Program ("DAEP") for M.F.'s supposed violation of the District's Student Handbook and Code of Conduct (the "Code of Conduct"). Mrs. Fisher asked for how long Ray believed the District was considering placing M.F. in DAEP, and Ray told her one to six *weeks*.

43.     The next day, Wormley called Mrs. Fisher to ask if she had any questions about the situation. During their conversation, Wormley told Mrs. Fisher that in "most cases" in "most districts," serving a three-day suspension would be sufficient, but that it was "different" in the District because "the parents are more involved."

44.     On Thursday, October 26, Mr. and Mrs. Fisher received correspondence from the District via Ray, stating that she would be conducting an investigation into the purported wrongdoings of M.F. and that a meeting would be held the next day at the school for M.F. to tell his side of the story.

45.     Later that day, less than twenty-four hours before that meeting, Ray communicated that if Mr. and Mrs. Fisher wanted to bring counsel to the meeting on M.F.'s behalf, they would need to provide twenty-four-hour notice to the District—obviously an impossible condition.

46.     That next day, Friday, October 27, M.F., Mr. Fisher, Mrs. Fisher, M.F.'s grandfather, and counsel went to Durham for the meeting called by the District. Attending the meeting for the District were Wheeler, Ray, Wormley, and counsel for the District.

47.     Once there, Ray began reading from a script and stated that the meeting served as the administrative hearing into the matter at issue. In stating the "allegations" against M.F., Ray simply recited the provision from the Code of Conduct M.F. purportedly violated. When M.F.'s counsel asked Ray to state the factual allegations underlying M.F.'s purported infraction, Ray

stated that she already had and proceeded to read once again from the Code of Conduct.  On information and belief, Ray and Wheeler viewed themselves as justified in taking the approach they took because of the loose and inadequate guidance in the Code of Conduct itself.  With such loose and inadequate guidance, the Code of Conduct in effect authorizes and encourages reckless behavior on the part of administrators bound and determined to impose severe punishments for relatively minor alleged offenses, even when those alleged offenses took place outside of school hours and off school property.  On information and belief, the school board for the Carroll Independent School District—the policymaker for the school district—promulgates and is otherwise responsible for the Code of Conduct in which such loose and inadequate guidance is contained.  On information and belief, the Code of Conduct constitutes a set of policies and practices of the Carroll Independent School District which, by authorizing and encouraging the impermissible behavior of the school administrators recounted above, proximately injured Plaintiff.

48.    When pressed by M.F.'s counsel yet again, Wheeler spoke up, stating that M.F. had posted inappropriate material on the TikTok account. M.F.'s counsel asked Wheeler to show what posts, if any, the District possessed and which of those posts M.F. created and published.

49.    Wheeler first showed the post showing Minor #1, for which M.F. took responsibility there and then. Wheeler then showed a second post and attributed it to M.F.—but when M.F. was asked by his counsel, he confirmed that he neither created nor published that post. The District had incorrectly attributed someone else's speech to M.F.

50.    Next, M.F. was given the opportunity to tell his side of the story. Unlike during the District's interrogations, M.F. had spoken to his parents, had his parents present, and had counsel with him. As such, he was no longer scared of and confused by the situation, and he provided an

accurate rendition of the events. He took responsibility for the posts he created and published, and expressed sincere remorse and regret for doing so.

51.     Before the meeting broke for further deliberations by the District, M.F.'s counsel directed Wheeler and Ray to various pages in the Code of Conduct listing the vast array of disciplinary actions the District permits as to its students—wherein placement in DAEP is listed as the second-most severe punishment aside from expulsion. M.F.'s counsel asked Wheeler and Ray if they considered any of the other disciplinary actions for M.F. before DAEP, since M.F. is an excellent academic performer with no serious disciplinary infractions on his record.

52.     Wheeler and Ray had no answer to the question.

53.     At the end of the meeting, Ray informed the attendees that the District would deliberate given M.F.'s statement that day and promptly inform the Fishers of the District's disciplinary decision.

54.     Despite everything that occurred at that meeting and the ample time for the District to reconsider its decision, nothing changed. On Sunday, October 29, the District informed M.F. and his parents that the original recommendation would stand—M.F. was to report to DAEP for a sentence of forty-five school days beginning on Monday, October 30. Evidently, evidence had little—if anything—to do with the District's decision.

55.     To add insult to injury, the DAEP placement was set for forty-five days because, as Wheeler swore under penalty of perjury, that was the "minimum" punishment. But that is not true according to the current Student Code of Conduct.

56.     Out of options to meaningfully address the egregious overexertion of authority the District had engaged in, M.F. and his parents turn to this Court to right what the off-the-rails officials of the District have wrought upon an eleven-year-old child.

## IV.    CAUSES OF ACTION

### COUNT ONE

**Violation of the First Amendment to the United States Constitution
under 42 U.S.C. § 1983
(M.F. against the District, Wheeler, and Ray)**

57.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

58.    M.F. engaged in protected speech while off campus and outside of school.

59.    When the District learned of this protected speech, the District, through its employees and agents, conducted an "investigation" into the off-campus, out-of-school speech.

60.    After "investigating" the off-campus, out-of-school speech, which involved detaining and interrogating M.F. without explaining his rights to M.F. and without informing or receiving consent from M.F.'s parents, the District determined that M.F. was the speaker. From then, the District issued M.F. out-of-school suspension until the District could conduct its disciplinary hearing.

61.    At the disciplinary hearing, the District, through its employees and agents, preliminarily informed M.F. that the District intended to place M.F. in DAEP for the rest of the semester—forty-five school days—as punishment for his off-campus, out-of-school speech.

62.    Following the disciplinary hearing, and in the face of new evidence, the District did not alter its intended punishment for M.F.

63.    In imposing the punishment on M.F. for his off-campus, out-of-school speech, the District, through its employees and agents, acted under color of state law.  The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

64.     The District's punishment of placing M.F. in DAEP for his off-campus, out-of-school speech violates the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment.

### COUNT TWO
**Violation of the First Amendment to the United States Constitution
under 42 U.S.C. § 1983
(M.F. against the District, Wheeler, and Ray)**

65.     Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

66.     The Code of Conduct states that the District has jurisdiction to discipline students, *inter alia*, "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location."

67.     On its face, this policy extends the District's authority over students such as M.F. considerably past what federal law and the United States Constitution permit.

68.     Public schools do possess "a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). But this is no carte blanche.

69.     In particular, off-campus speech "will normally fall within the zone of parental, rather than school-related, responsibility," and "courts must be more skeptical of a school's efforts to regulate off-campus speech." *Id.* at 2046.

70.     The Code of Conduct's purported authority to discipline students "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location" is vastly overbroad, sweeping within it considerable amounts of speech and conduct protected by the First Amendment to the United States Constitution.

71.     The Code of Conduct's purported authority to discipline students "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location" also constitutes content-based discrimination under the First Amendment to the United States Constitution, as the District can enforce—and has enforced—the Code of Conduct as to students' speech based solely on content (specifically, content the District does not subjectively approve of).

72.     Because the Code of Conduct is overbroad and breeds content-based restrictions on constitutionally protected speech, the Code of Conduct violates the United States Constitution. The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

## COUNT THREE
### Violation of the First Amendment to the United States Constitution under 42 U.S.C. § 1983
### (M.F. against the District, Wheeler, and Ray)

73.     Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

74.     The Code of Conduct states that the District has jurisdiction to discipline students, *inter alia*, "[f]or any misconduct substantially likely to create a material disruption of the orderly operation of school, regardless of time or location."

75.     On its face, this policy extends the District's authority over students such as M.F. to just about any speech or conduct in which students may engage.

76.     The Code of Conduct's pervading reach into the realm of protected speech is constitutionally problematic—it is impossible to tell from the text of the Code of Conduct what speech falls within the District's self-given disciplinary authority. As a result, the Code of Conduct is constitutionally void for vagueness.

77.     A government policy implicating the First Amendment is void for vagueness when it is "unclear whether it regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008). The void-for-vagueness doctrine requires state authorities to "articulate a proscription 'with sufficient definiteness that ordinary people can understand what conduct is prohibited' while providing enough objective metrics that it 'does not encourage arbitrary and discriminatory enforcement.'" *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 580 (5th Cir. 2012) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 132 (2007)).

78.     No ordinary person looking at the Code of Conduct can understand what conduct is prohibited. For instance, in this case, M.F. did not and could not have had notice that his protected speech, though crude, would subject him to discipline from anyone other than his parents, but especially not the public school he attends.

79.     Furthermore, the Code of Conduct provides almost zero objective metrics by which its standards will govern students. As is evident in M.F.'s case, this encouraged the District to enforce the Code of Conduct against M.F. in an arbitrary and discriminatory manner.

80.     Thus, the Code of Conduct is void for vagueness and thereby constitutionally infirm.   The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

### COUNT FOUR
**Violation of the Fourteenth Amendment to the United States Constitution
under 42 U.S.C. § 1983
(M.F. against the District, Wheeler, and Ray)**

81.     Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

82.     M.F. has a constitutional right in the parent-child relationship for his parents to make decisions concerning his "care, custody, and control." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).

83.    The degree to which the District actually stood *in loco parentis* while Southlake, through Wormley, seized M.F. by placing him in custody, interrogated M.F., and searched M.F.'s phone is not yet clear. *See Mahanoy*, 141 S. Ct. at 2051–53 (Alito, J., concurring).

84.    If the District was standing *in loco parentis* as these events transpired, the District utterly failed to do so properly.

85.    The District did not inform M.F. of his right to remain silent when taken into custody by Wormley. The District did not inform M.F. of his right to an attorney when taken into custody by Wormley. The District did not place any of its employees or agents in the interrogation room with M.F. when Wormley took M.F. into custody.

86.    In other words, the District failed at every turn in its actions regarding the care, custody, and control of M.F. to the extent the District stood *in loco parentis*.

87.    If the District was not standing *in loco parentis* as these events transpired, the District completely neglected involving Mr. and Mrs. Fisher to ensure that M.F.'s Fourteenth Amendment right for his parents to make decisions concerning his care, custody, and control was protected.

88.    In fact, the District failed entirely to comply with its own rules and regulations. For instance, when a law enforcement officer like Wormley wishes to question or interview a Durham student at school, the District, through Wheeler, must "[v]erify and record the identity of the officer or other authority and ask for an explanation of the need to question the student at school"; "[m]ake reasonable efforts to notify the parents and gain consent"; and "[b]e present for the questioning or interview." The District did none of these things.

89.    Whether or not the District stood *in loco parentis* as to M.F. during these events, the District's actions (and nonactions) violated M.F.'s Fourteenth Amendment right for his parents

to make decisions concerning his care, custody, and control. The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

## COUNT FIVE
### Violation of the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983
### (M.F. against the District, Wheeler, and Ray)

90.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

91.    The state of Texas has chosen to extend the right to an education to individuals like M.F. *See* Tex. Const. art. VII, § 1; Tex. Educ. Code §§ 4.001, 25.001, 25.085.

92.    Because the state of Texas has chosen to extend this right, M.F. may not be deprived of that right on grounds of misconduct absent fundamentally fair procedures to determine whether the alleged misconduct has occurred.

93.    Because the District did not use fundamentally fair procedures in disciplining M.F., M.F.'s property interest in education was annihilated by the District.

94.    Only after involving a law enforcement officer in its investigation, the District, through its employees and agents, coerced a "confession" out of M.F. regarding off-campus, out-of-school speech without notifying or involving M.F.'s parents.

95.    At the "hearing" regarding the alleged misconduct, the District, through Wheeler and Ray, held a sham proceeding in which they offered almost zero evidence regarding the alleged misconduct. Wheeler and Ray revealed the District's only "evidence" regarding M.F.'s alleged misconduct at the behest of M.F.'s counsel (which the District consistently tried to deprive M.F. from having during the process).

96.    The evidence the District presented at the "hearing" only demonstrated that M.F. created and published a single post on the TikTok account in question. The District offered no

evidence at any time at the "hearing" or before handing down the final disciplinary action that M.F. was created or published the post that Minor #2 created and published.

97.     Despite this lack of evidence, the District, through Wheeler and Ray, proceeded to punish M.F. arbitrarily and capriciously—clearly motivated by social justice warriors on the Internet and in complete neglect of their pedagogical duties to educate schoolchildren.

98.     Wheeler and Ray forced a punishment on to M.F. for something he did not do, and for something over which Wheeler and Ray have no authority. They were shamefully irresponsible as educators and adults throughout the minimal "process" the District afforded M.F.

99.     Because the state of Texas affords individuals like M.F. a property interest in educational benefits, depriving him of any meaningful process violated the Fourteenth Amendment and the due process clause of that Amendment.

100.     The discipline imposed on M.F. for his alleged misconduct—DAEP—is a deprivation of M.F.'s property interest.

101.     Unlike at Durham, DAEP for M.F. has not had teachers actively educating him. M.F. has simply been supposed to self-teach the material students at Durham are learning from state-certified educators. Forcing a pre-teenage child to teach himself is an utter deprivation of the educational benefits the state of Texas provides to him.  The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

## COUNT SIX
**Violation of the Fourteenth Amendment to the United States Constitution
under 42 U.S.C. § 1983
(M.F. against the District, Wheeler, and Ray)**

102.     Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

103.     Individuals like M.F. have a liberty interest in their "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

104.     Because the District did not use fundamentally fair procedures in disciplining M.F., M.F.'s liberty interest in his good name, reputation, honor, and integrity was transgressed by the District. Doing so violated M.F.'s due-process rights.  The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

**<u>COUNT SEVEN</u>**
**Violation of the Fourteenth Amendment to the United States Constitution**
**under 42 U.S.C. § 1983**
**(Mr. and Mrs. Fisher against the District, Wheeler, and Ray)**

105.     Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

106.     Mr. and Mrs. Fisher individually have a constitutional right in the parent-child relationship to make decisions concerning M.F.'s "care, custody, and control." *Troxel*, 530 U.S. at 65.

107.     The degree to which the District actually stood *in loco parentis* while Southlake, through Wormley, seized M.F. by placing him in custody, interrogated M.F., and searched M.F.'s phone is not yet clear. *See Mahanoy*, 141 S. Ct. at 2051–53.

108.     If the District was standing *in loco parentis* as these events transpired, the District utterly failed to do so properly.

109.     The District did not inform M.F. of his right to remain silent when taken into custody by Wormley. The District did not inform M.F. of his right to an attorney when taken into custody by Wormley. The District did not place any of its employees or agents in the interrogation room with M.F. when Wormley took M.F. into custody.

110.    In other words, the District failed at every turn in its actions regarding the care, custody, and control of M.F. to the extent the District stood *in loco parentis*.

111.    If the District was not standing *in loco parentis* as these events transpired, the District completely neglected involving Mr. and Mrs. Fisher to ensure that their Fourteenth Amendment right to make decisions concerning M.F.'s care, custody, and control was protected.

112.    In fact, the District failed entirely to comply with its own rules and regulations. For instance, when a law enforcement officer like Wormley wishes to question or interview a Durham student at school, the District, through Wheeler, must "[v]erify and record the identity of the officer or other authority and ask for an explanation of the need to question the student at school"; "[m]ake reasonable efforts to notify the parents and gain consent"; and "[b]e present for the questioning or interview." The District did none of these things.

113.    Whether or not the District stood *in loco parentis* as to M.F. during these events, the District's actions (and nonactions) violated Mr. and Mrs. Fisher's Fourteenth Amendment right to make decisions concerning M.F.'s care, custody, and control.  The school board in effect authorized and encouraged the District's impermissible activities through the policies and practices imbedded in the Code of Conduct.

### COUNT EIGHT
**Violation of the Fourth Amendment to the United States Constitution
under 42 U.S.C. § 1983
(M.F. against Southlake and Wormley)**

114.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

115.    Wormley removed M.F. from class, placed M.F. in an enclosed space with the door closed, and, in his Southlake Police Department uniform, interrogated M.F. one-on-one, outside the presence of school officials or M.F.'s parents. Given these circumstances, no reasonable eleven-year-old child would have felt at liberty to terminate the interrogation and leave.

116.    In other words, Wormley had seized M.F.

117.    At the time of the seizure, Wormley did not have a warrant to conduct such seizure.

118.    At the time of the seizure, Wormley did not have probable cause that M.F. had engaged in or was engaged in criminal activity.

119.    At the time of the seizure, Wormley did not believe that M.F. had engaged in delinquent conduct or conduct in need of supervision.

120.    At the time of the seizure, there were no exigent circumstances present or any other circumstances that could justify Wormley's seizure of M.F. absent a warrant.

121.    As such, Wormley's seizure of M.F. was unreasonable, thereby violating the Fourth Amendment.  On information and belief, Wormley employed policies and practices of the City of Southlake as promulgated by its Chief of Police that are designed for adult suspects but that do not properly distinguish between adults and young schoolchildren upon whom the effects and impacts of the employment of such policies and practices would be disastrous and long-lasting.

### COUNT NINE
**Violation of the Fourth Amendment to the United States Constitution**
**under 42 U.S.C. § 1983**
**(M.F. against Southlake and Wormley)**

122.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

123.    Wormley removed M.F. from class, placed M.F. in an enclosed space with the door closed, and, in his Southlake Police Department uniform, interrogated M.F. one on one, outside the presence of school officials or M.F.'s parents.

124.    During that interrogation, Wormley demanded that M.F. produce his cell phone and give it to Wormley.

125.    Once M.F., a child unaware of his Fourth Amendment rights, surrendered his cell phone to Wormley under coercive pressure, Wormley demanded that M.F. unlock the phone.

126.    M.F., a child unaware of his Fourth Amendment rights, unlocked his cell phone for Wormley upon Wormley's forceful, coercive command.

127.    Once the cell phone had been unlocked, Wormley searched through the cell phone's contents.

128.    By taking M.F.'s cell phone, forcing M.F. to unlock the cell phone, and searching the contents of the cell phone, Wormley had conducted a search.

129.    At the time of the search, Wormley did not have a warrant to conduct such search.

130.    At the time of the search, Wormley did not have probable cause that M.F. had engaged in or was engaged in criminal activity.

131.    At the time of the search, Wormley did not believe that M.F. had engaged in delinquent conduct or conduct in need of supervision.

132.    At the time of the search, there were no exigent circumstances present or any other circumstances that could justify Wormley's search of M.F.'s cell phone absent a warrant.

133.    As such, Wormley's search of M.F.'s cell phone was unreasonable, thereby violating the Fourth Amendment. .  On information and belief, Wormley employed policies and practices of the City of Southlake as promulgated by its Chief of Police that are designed for adult suspects but that do not properly distinguish between adults and young schoolchildren upon whom the effects and impacts of the employment of such policies and practices would be disastrous and long-lasting.

## COUNT TEN
**Violation of the Fourteenth Amendment to the United States Constitution
under 42 U.S.C. § 1983
(M.F. against Southlake and Wormley)**

134.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

135.    M.F. has a constitutional right in the parent-child relationship for his parents to make decisions concerning his "care, custody, and control." *Troxel*, 530 U.S. at 65.

136.    Wormley never once attempted to notify M.F.'s parents (let alone the District) before he removed M.F. from class, interrogated M.F. in a room one-on-one with the door closed, and forced M.F. to open his cell phone and search it.

137.    In doing so, Wormley deprived M.F. of his Fourteenth Amendment right for his parents to make decisions concerning his care, custody, and control. .  On information and belief, Wormley employed policies and practices of the City of Southlake as promulgated by its Chief of Police that are designed for adult suspects but that do not properly distinguish between adults and young schoolchildren upon whom the effects and impacts of the employment of such policies and practices would be disastrous and long-lasting.

## COUNT ELEVEN
### Violation of the Fourteenth Amendment to the United States Constitution
### under 42 U.S.C. § 1983
### (Mr. and Mrs. Fisher against Southlake and Wormley)

138.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

139.    Mr. and Mrs. Fisher individually have a constitutional right in the parent-child relationship to make decisions concerning M.F.'s "care, custody, and control." *Troxel*, 530 U.S. at 65.

140.    When a child has a claim against a state actor for violation of the Fourth Amendment, that child's parents have a claim against the same state actor for violation of the parents' Fourteenth Amendment rights to make decisions regarding the child's care, custody, and control.

141.    Because Wormley unreasonably seized M.F. in violation of the Fourteenth Amendment, Wormley also violated Mr. and Mrs. Fisher's Fourteenth Amendment rights to make

decisions regarding M.F.'s care, custody, and control. On information and belief, Wormley employed policies and practices of the City of Southlake as promulgated by its Chief of Police that are designed for adult suspects but that do not properly distinguish between adults and young schoolchildren upon whom the effects and impacts of the employment of such policies and practices would be disastrous and long-lasting.

## COUNT TWELVE
### Violation of the Fourteenth Amendment to the United States Constitution
### under 42 U.S.C. § 1983
### (Mr. and Mrs. Fisher against Southlake and Wormley)

142.    Plaintiffs incorporate by reference the factual averments as if fully set forth herein.

143.    Mr. and Mrs. Fisher individually have a constitutional right in the parent-child relationship to make decisions concerning M.F.'s "care, custody, and control." *Troxel*, 530 U.S. at 65.

144.    When a child has a claim against a state actor for violation of the Fourth Amendment, that child's parents have a claim against the same state actor for violation of the parents' Fourteenth Amendment rights to make decisions regarding the child's care, custody, and control.

145.    Because Wormley unreasonably searched M.F. in violation of the Fourteenth Amendment, Wormley also violated Mr. and Mrs. Fisher's Fourteenth Amendment rights to make decisions regarding M.F.'s care, custody, and control. On information and belief, Wormley employed policies and practices of the City of Southlake as promulgated by its Chief of Police that are designed for adult suspects but that do not properly distinguish between adults and young schoolchildren upon whom the effects and impacts of the employment of such policies and practices would be disastrous and long-lasting.

## PRAYER FOR RELIEF

146.    Michael Fisher, individually and as next friend and parent to M.F., and Katherine Fisher, individually and as next friend and parent to M.F., prays this Court:

A.    Declares, under 28 U.S.C. §§ 2201–02, that the District's disciplinary action against M.F. for his off-campus, out-of-school speech violated M.F.'s rights under the First Amendment to the United States Constitution as incorporated by the Fourteenth Amendment;

B.    Declares, under 28 U.S.C. §§ 2201–02, that the District's Student Code of Conduct, on its face, violates the First Amendment to the United States Constitution as incorporated by the Fourteenth Amendment because it is overbroad and breeds content-based discrimination;

C.    Declares, under 28 U.S.C. §§ 2201–02, that the District's Student Code of Conduct has been used, and may be used, to punish off-campus, out-of-school speech is unconstitutionally vague, and thereby violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

D.    Declares, under 28 U.S.C. §§ 2201–02, that the District deprived M.F. of his right to family integrity and any process due to M.F. pursuant to that right, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

E.    Declares, under 28 U.S.C. §§ 2201–02, that the District deprived M.F. of his "property interest in educational benefits" and any process due to M.F. pursuant to that interest, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

F.    Declares, under 28 U.S.C. §§ 2201–02, that the District deprived M.F. of his "liberty interest in reputation" and any process due to M.F. pursuant to that interest, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

G.    Declares, under 28 U.S.C. §§ 2201–02, that the District deprived Mr. and Mrs. Fisher of their right to family integrity and any process due to Mr. and Mrs. Fisher pursuant to that right, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

H.    Declares, under 28 U.S.C. §§ 2201–02, that Southlake effected an unreasonable seizure against M.F., which violates the Fourth Amendment to the United States Constitution;

I.    Declares, under 28 U.S.C. §§ 2201–02, that Southlake effected an unreasonable search against M.F., which violates the Fourth Amendment to the United States Constitution;

J.    Declares, under 28 U.S.C. §§ 2201–02, that Southlake deprived M.F. of his right to family integrity and any process due to M.F. pursuant to that right, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

K.    Declares, under 28 U.S.C. §§ 2201–02, that by affecting an unreasonable seizure against M.F., Southlake deprived Mr. and Mrs. Fisher of their right to family integrity and any process due to Mr. and Mrs. Fisher pursuant to that right, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

L.    Declares, under 28 U.S.C. §§ 2201–02, that by affecting an unreasonable search against M.F., Southlake deprived Mr. and Mrs. Fisher of their right to family integrity and any process due to Mr. and Mrs. Fisher pursuant to that right, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

M.    Enjoins Defendants on a permanent basis from violating the Constitution in any of the manners complained of in this action;

N.    Awards Plaintiffs damages in an amount to be determined at trial;

O.    Awards Plaintiffs costs and reasonable attorney's fees under 42 U.S.C. § 1988(b); and

P.    Grants such other legal and equitable relief as may be available that the Court deems proper.

Dated: January 26, 2024                    Respectfully submitted,

                                           */s/* Mark Whitburn
                                           **Mark Whitburn**
                                           Texas Bar No. 24042144
                                           mwhitburn@whitburnpevsner.com
                                           **Sean Pevsner**
                                           Texas Bar No. 24079130
                                           spevsner@whitburnpevsner.com
                                           **WHITBURN & PEVSNER, PLLC**
                                           2000 E. Lamar Boulevard, Suite 600
                                           Arlington, Texas 76006
                                           T: (817) 653-4547
                                           F: (817) 653-4477

                                           **ATTORNEYS FOR PLAINTIFFS**

                        **CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via ECF on all counsel of record on January 26, 2024.

                                           */s/*    Mark Whitburn
                                           Mark Whitburn